**MARTIN MARIETTA CORPORATION, Plaintiff,**

v.

**The EVENING STAR NEWSPAPER COMPANY et al., Defendants.**

**Civ. A. No. 75–1827.**

United States District Court, District of Columbia.

July 26, 1976.

948

Gerald M. Stern, Rogovin, Stern & Huge, Washington, D. C., for plaintiff.

Stuart F. Pierson, Verner, Liipfert, Bernhard, McPherson & Alexander, Washington, D. C., for defendant Star.

## MEMORANDUM

FLANNERY, District Judge.

This libel action arises from an article written by defendant Peter Gruenstein, copyrighted and distributed by defendant Capitol Hill News Service (CHNS), and published by defendant Evening Star Newspaper Company (Star) in the *Washington Star*. The article appeared in all four editions of the *Star* printed on October 31, 1975. Plaintiff Martin Marietta Corporation filed a complaint on November 4, 1975, requesting $5,000,000 in compensatory damages, $10,000,000 in punitive damages, and an injunction requiring the *Star* to print a retraction admitting the falsity of the article. The matter is now before the court on defendant Star's motion for summary judgment. The court, finding no genuine issue to exist as to any material fact, and finding that defendant is entitled to judgment as a matter of law, will grant the

motion. Further, the court has determined that there is no just reason for delay in the entry of this judgment, and, consequently, will order the clerk to place it on the docket forthwith. The entry of the judgment will render moot the Star's pending motion for a protective order and plaintiff's pending request for a hearing to schedule discovery.

## I

### Facts

The article giving rise to this action, which is attached as Appendix A to this memorandum, appeared on the front page of the *Star* under the headline, "A Contractor's Stag Party for Boys at the Pentagon." The story, copyrighted by CHNS and attributed to Peter Gruenstein, stated that a weekend party for a soon to be married "top Air Force official" was held in January 1968 at a Wye Island, Maryland hunting lodge leased by plaintiff. Approximately one third of the 40 to 50 guests at the lodge were "Defense Department personnel," according to the article. The article also stated that two prostitutes attended the party and that one was paid $3,000 for her services "by a Martin Marietta representative." One of the prostitutes "reportedly swung naked from the antlers of an animal head mounted on one of the lodge's walls."

In addition to the above allegations, variously attributed to "sources" and "guests", the article included a disclaimer attributed to Martin Marietta Vice-President for Public Relations Roy Calvin. According to the story,

A Martin Marietta spokesman said: "We don't find any record that any Martin employees were present or involved in the arrangement.

"My impression was it (the party) was at least two years after we had any connection" with the lodge. . . .

The story also alluded to a statement by then Defense Secretary James R. Schlesinger that activities such as those described were commonplace in the defense industry and to statements by a McDonnell Douglas employee that the industry has, in some cases, procured prostitutes for military officials. Finally, the article mentions that similar allegations have been made about other defense contractors and that Capitol Hill News Service had, in previous articles reported that Northrop Corporation, Rockwell, and Raytheon Company, all defense contractors, had entertained Pentagon officials with hunting trips in Maryland. The Star paid CHNS $200 for the story.

Entertainment of military officials by defense contractors, including Martin Marietta, has been a topic of public debate for several years. The problem was considered quite serious by President Johnson, who, on May 11, 1965, signed Executive Order 11222, forbidding government employees from accepting entertainment or other similar benefits from persons seeking to establish financial relationships with the government. The Order is implemented by Department of Defense Directive 5500.7, 32 C.F.R. § 40.5 (1975). The entertainment activities of the Martin Company, which consolidated with the American Marietta Company in 1961, were the subject of hearings held in 1959 by the Subcommittee for Special Investigations of the House of Representatives Committee on Armed Services.

In the weeks immediately preceding publication of the article, plaintiff's name began to appear with increasing frequency in connection with disclosures concerning entertainment of military officials by Northrop Corporation. The disclosures about Northrop prompted Representative Wright Patman to announce on October 14, 1975, that the Joint Committee on Defense Production would investigate recent reports that defense officials had accepted favors and gratuities from defense contractors, who subsequently charged some of those costs to overhead on their government contracts, the *Washington Post* to report on October 16, 1975 that FBI agents and the Justice Department had commenced investigations of Northrop's conduct, Senator Proxmire to issue a press release on October 16, 1975, criticizing the Defense Department's investigation of Northrop as a "whitewash," and the *New York Times* to

report on October 18, 1975 that Defense Secretary Schlesinger had ordered an inquiry into the entertainment of Defense Department officials by defense contractors.

On October 22, 1975, the *Star* published an article written by Peter Gruenstein and distributed by CHNS entitled "3 Other Firms Entertained VIP's." The article stated that Rockwell International Corporation, Raytheon, and Martin Marietta used hunting facilities in Maryland to entertain Defense Department officials and members of Congress. Between October 22 and October 27 at least thirteen newspapers across the country carried versions of this story, attributed to CHNS, and each version mentioned Martin Marietta. The October 22 article was the twelfth in a series on defense contractor entertainment activities written by Gruenstein, distributed by CHNS, and printed by the Star. The first article in the series, which focused primarily on Northrop Corporation, appeared on May 8, 1975.

An article by William H. Jones on the congressional investigation of the relationship between defense contractors and the Pentagon was published in the *Washington Post* on October 23, 1975. According to the article, congressional investigators related that at least five of the largest defense contractors maintain hunting and fishing lodges for use by Defense Department officials or arrange hunting vacations for these officials. Further, the investigators were said to have named Martin Marietta as one of the firms known to have entertained military officials at an Eastern Shore hunting lodge. Numerous papers across the country printed versions of the Jones article, all mentioning Martin Marietta, on October 22, 23, and 24.

On October 23, 1975, an article by Robert Lenzner in the *Boston Globe*, entitled "Raytheon Co. admits 'trips' for US officials," detailed congressional staff allegations against Raytheon and the company's response. In addition, the article mentioned Martin Marietta as one of the companies under investigation for similar conduct.

Clark Mollenhoff wrote an article for the October 24 *Des Moines Register* entitled "GAO to Probe Defense Firm Hospitality." The story reported that Senator Proxmire had requested the General Accounting Office to investigate the entertainment practices of several defense contractors, specifically including Martin Marietta. On October 25, 1975, many newspapers carried stories about the Proxmire request and made references to plaintiff. An Associated Press story appearing on October 26 and 27 also referred to Proxmire's request that Martin Marietta be investigated, although the focus of the story was a report that Admiral Harold E. Shear used Northrop hunting lodge facilities.

The *Washington Post* of October 28, 1975, published an article entitled "Goose Guide Shrugs at Northrop 'Fuss'," by Karen De Young. The article described the reaction of a goose guide and Eastern Shore residents to news reports of defense contractor entertaining at hunting lodges in the area and mentioned Martin Marietta as one of the companies reported to have sponsored hunting trips for government officials. Between October 28 and October 30 various versions of the article appeared in numerous papers.

Martin Marietta's business status as of October 1975 reinforced its association with the topic of entertainment in the defense industry. The corporation was the 20th largest defense contractor in fiscal year 1975, receiving $320.3 million in public funds from defense contracts. In furtherance of its business interests, Martin Marietta regularly provided uniformed officers and Defense Department officials with free transportation on company aircraft and free access to the hunting facilities at Wye Island. In addition, the company regularly participated in advisory panels, technical exchange programs, and private defense and aerospace related organizations.

Against this backdrop, preparation of the October 31 article began. Undisputed portions of the record amassed in the instant case reveal that the following *Star* employees, and only the following *Star* employees,

played a direct role in the publication of the article: Editor James Bellows, Managing Editor Sidney Epstein, National Editor Barbara Cohen,[1] and Ross Evans, a National Desk Editor. Author Gruenstein was not employed by the *Star*, but by CHNS at the time he prepared the article. CHNS, a nonprofit corporation chartered in 1974, operated as an independent news service, supplying its regular subscribers with daily stories concerning activities in Washington, D.C. In addition, CHNS regularly contacted the Washington offices of the *Star*, the *Detroit News*, the *Saint Louis Post Dispatch*, the *Los Angeles Times*, and the *Des Moines Register-Tribune* to ascertain whether these nonsubscribers would be interested in buying specific pieces prepared for general distribution to regular customers.[2] Prior to October 31, 1975, the *Star* had purchased 14 articles from CHNS, including the 12 in the defense contractor series, for fees ranging from $50 to $150.

The *Star* first learned that Gruenstein was working on the story which eventually became the allegedly libelous article on October 24, 1975. On this date, Gruenstein spoke with Barbara Cohen, the editor who had handled the previous 12 articles in the defense contractor series, and informed her that he was following some leads concerning the providing of prostitutes for Defense Department personnel. Cohen informed Gruenstein that the *Star* would be interested in using the article if it was specific in its allegations. Cohen also granted Gruenstein's request for use of the *Star's* "morgue" in preparing the story.

Cohen next heard from Gruenstein on October 27 or 28, when he informed her that he was nearing the conclusion of his investigation and might have an article ready to go by the end of the week. She, in turn, mentioned the possibility that a story by Gruenstein on defense contractors and prostitutes might be available for the weekend editions of the *Star* at the weekly editors meeting held on Tuesday, October 28. Editor James Bellows indicated that, if the article panned out, it was a likely candidate for publication.

Gruenstein actually delivered the article on Thursday, October 30.[3] In addition to providing the *Star* with the article on that day, CHNS sent it to all its subscribers and to the *Detroit* News, which had expressed an interest in the story. The *St. Louis Post Dispatch* similarly received the story on October 30 or 31.[4]

After reading the article several times, Cohen called Gruenstein to discuss its accuracy. During the course of the discussion, Gruenstein affirmatively vouched for the reliability of his sources, the date of the party, the payment to the prostitute, the nature of the Martin Marietta denial, Martin Marietta's lease of the lodge, the care of his investigation, and the general use of prostitutes by defense contractors. Gruenstein also stated that he had personally spoken with the three guests mentioned in the second paragraph of the article. The only detail Gruenstein could not support unequivocally was the type of animal head from which the prostitute swung and Cohen stated that she was going to substitute "stuffed animal head" for "moose head" to alleviate any possibility of error.

Cohen devoted special attention to paragraph 15 of the article which contained

1. Cohen's immediate supervisor according to the *Star's* editorial structure was Assistant Managing Editor Jack Germond, Chief for National Affairs. Germond's position did not necessarily require him to review Cohen's work, and it is clear that he had no direct involvement with the October 31 article.

2. In October, 1975, the *Star* subscribed to five news services, United Press International, The Associated Press, the Chicago Tribune-New York Times Syndicate, Inc., and the Dow Jones News Service.

3. The article, as submitted by Gruenstein, is attached as Appendix B.

4. The *Post Dispatch* did not run the article. The *News* published the article on October 31, under the headline, "Were Prostitutes at Md. Party for Pentagon Aides?" The *News* also deleted the reference to the $3,000 payment. Several subscribers of CHNS ran the story as written by Gruenstein.

broad allegations of procuring by other defense contractors. Cohen declared that the paragraph was too vague and that she would recommend its deletion from the article. Gruenstein advocated the retention of the paragraph since it indicated that Martin Marietta was not alone in engaging in this type of conduct.[5]

Following her conversation with Gruenstein, Cohen changed the moose head reference and deleted paragraphs seven and eight. These paragraphs, describing the rental of another hunting lodge by Martin Marietta, did not relate to the stag party episode and were considered irrelevant. After consultation with Bellows, Cohen deleted a portion of paragraph fifteen [6] and made certain other stylistic alterations. Cohen then left the article with Ross Evans, instructing him to check with Gruenstein the accuracy of a modifying phrase she had added and to implement a Bellows suggestion that a good description of the regulations pertaining to entertainment of Defense Department personnel be inserted early in the article. Evans performed these tasks that evening.

Bellows arrived at the *Star* early in the morning on October 31 to perform his usual tasks of preparing the promotion blurbs for the top of the front page. He and Epstein had agreed the preceding afternoon that if the Gruenstein article was ready, it would run on the front page of the October 31 paper. Finding the story on page one of the planned first edition, Bellows prepared the promotion blurb "Stag Parties Attended by Pentagon Officials." [7] The story then ran in the first and second editions.

At approximately twelve noon on the 31st George Bunker, Chairman of the Board of Martin Marietta, telephoned Epstein, a personal friend, and objected to the Gruenstein article. Although there is conflicting deposition testimony by the principals as to certain aspects of the conversation, both agree that Bunker informed Epstein that the entire article was false, that a libel suit was being considered, and that employees of Martin Marietta would not do business in the fashion reported by Gruenstein. Epstein recalls Bunker to have added, after his denial, that if he ever found out that Martin Marietta employees were involved with the party he would fire several hundred of them. Bunker claims that in response to an initial statement that the article was incorrect, Epstein stated that there may be some problem with the date but that the rest of the story was correct. Bunker then claims to have answered that it was not just the date, but the whole story was wrong.

At the time Bunker phoned Epstein, two editions of the *Star* had not yet been printed. The press run for the third edition began at 1:00 p. m. and the run for the fourth began at 2:45 p. m. The *Star* maintains that under its printing procedures, substantive changes could not have been made after 12:00 noon and 1:30 p. m. for each edition, respectively. In the face of Bunker's call and the impending deadlines, Epstein contacted Cohen and asked whether she still believed in the article. Upon learning that Bunker's objections were general, rather than specific, and apparently based on second-hand information, she expressed continuing confidence in the story. Epstein then decided not to kill the article in the remaining editions. This decision was concurred in by Bellows and Robert Nelson, house counsel.

5. In full, paragraph 15 of Gruenstein's article read,

> In an investigation, Capitol Hill News Service has also learned from various sources that a number of other defense contractors have paid prostitutes in recent years to entertain at various functions at which Pentagon employees have been guests. Prostitutes have been hired for: hospitality suites at different military association meetings, as well as at Touchdown Club banquets held here annually in January; Washington suites leased by some defense firms; and, occasionally, at hunting parties. In at least a few cases, goose hunting guides have supplied prostitutes, sources said.

6. Cohen deleted the second sentence in the paragraph.

7. The other promotion blurb appearing at the top of the October 31 paper was "Newest Goalie Wins His First for Caps."

Shortly after she spoke with Epstein, Cohen received a call from Gruenstein about another story. Cohen mentioned Bunker's call, but did not really press for a detailed response. Later that afternoon, following a call from Paul Porter, plaintiff's counsel, Epstein decided to order a thorough check of Gruenstein's investigation. Epstein also informed plaintiff that it would print any further denials it wished to make, but the offer was declined.

Plaintiff filed this action on November 4, 1975. It simultaneously issued a press release announcing the event. Several papers, including the *Star*, carried the release.

## II

### *Applicability of the Malice Standard*

Recent decisions by the Supreme Court have established that mass media defendants, such as the Star, enjoy a conditional constitutional immunity from liability for publication of defamatory falsehoods. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court held that the first amendment provides the press with special protection from libel actions brought by public officials. In order to preserve the press' freedom to engage in uninhibited discussion of public issues, the Court ruled that a newspaper could not be held liable for a false story about a public official unless the plaintiff proved with "convincing clarity" that the publication was made with "actual malice." *Id.* at 279–80, 285–86, 84 S.Ct. 710. Shortly thereafter, in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court found that the protection provided in *New York Times* extended to cases brought by "public figures." *Id.* at 155, 87 S.Ct. 1975. In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), a plurality determined that the privilege applied where the publication concerned matters of general or public interest, regardless of the plaintiff's status. *Id.* at 43, 91 S.Ct. 1811 (Brennan, J.). The majority opinion in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), indicated that

the general rule announced in *Metromedia* was inappropriate for those cases where the reputations of natural persons were placed in jeopardy. When a natural person brings a libel suit, the court held, the malice standard of *New York Times* does not apply unless the plaintiff is a public figure for the range of issues discussed in the allegedly defamatory statement. *Id.* at 343, 345–46, 94 S.Ct. 2997. As is more fully explained below, the court finds that where a libel action is brought by a corporation, the rule announced in *Metromedia* remains the proper standard for determining the applicability of the *New York Times* malice standard.

■ Viewing the instant record in the light most favorable to plaintiff, the court concludes that plaintiff must prove actual malice because all reasonable jurors would agree that the October 31 article discussed issues of legitimate public importance, or, in the alternative, because all reasonable jurors would agree that Martin Marietta Corporation is a public figure under the standard set out in *Gertz v. Robert Welch, Inc., supra.* The court has taken an especially hard look at the facts and attempted in all instances where plaintiff contends issues to exist to assess the genuineness of the conflict. The use of summary judgment to terminate litigation in this fashion prevents all but the strongest libel cases from proceeding to trial, thereby advancing the first amendment policy of shielding the press from harassment. *Washington Post Co. v. Keogh*, 125 U.S.App.D.C. 32, 365 F.2d 965, 968 (1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); *Buchanan v. Associated Press*, 398 F.Supp. 1196 (D.D.C.1975); *see Wasserman v. Time, Inc.*, 138 U.S.App.D.C. 7, 424 F.2d 920, 922 (1970) (Wright, J., concurring).

### A.

### *Applicability to Corporate Plaintiffs*

■ In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), Justice Brennan's plurality opinion eschewed any distinction between libel actions brought by public plaintiffs and those

brought by private plaintiffs for purposes of applying the malice standard. Justice Brennan reasoned that such a distinction was not justified by the first amendment, which guarantees free debate of public issues, without regard to the individuals associated with those issues. *Id.* at 43, 91 S.Ct. at 1819. Thus, he stated, "The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety." *Id.*

Justice Brennan's position was rejected by a majority of the Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), because it took into consideration only society's interest in having a press free from the shackles of self-censorship while failing to protect society's strong and legitimate interest in preserving the reputations of private individuals. *Id.* at 341, 94 S.Ct. 2997; *see Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). It is quite clear from the Court's opinion, however, that the values considered important enough to merit accommodation with interests protected by the first amendment are associated solely with natural persons, and that corporations, while legal persons for some purposes, possess none of the attributes the Court sought to protect. Justice Powell's detailed explanation of the personal values deserving deference from the first amendment leaves no doubt that corporations must be excluded from the *Gertz* holding.

The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name

"reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the indi-

vidual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system."

418 U.S. at 341, 94 S.Ct. at 3008 (citation omitted).

The law of libel has long reflected the distinction between corporate and human plaintiffs by limiting corporate recovery to actual damages in the form of lost profits. As stated by a court in this district, "Although a corporation may maintain an action for libel, *it has no personal reputation* and may be libeled only by imputation about its financial soundness or business ethics." *Golden Palace, Inc. v. National Broadcasting Company, Inc.,* 386 F.Supp. 107 (D.D.C.1974) (emphasis added); *see* Prosser, Torts § 111 at 745 (4th ed. 1971). This traditional doctrine does no more than recognize the obvious fact that a libel action brought on behalf of a corporation does not involve "the essential dignity and worth of every human being" and, thus, is not "at the root of any decent system of ordered liberty." Consequently, a corporate libel action is not "a basic of our constitutional system," and need not force the first amendment to yield as far as it would be in a private libel action.

Even natural persons lose the protection afforded in *Gertz,* when, by assuming positions of public importance, they sacrifice their private lives. *See* 418 U.S. 344–45, 94 S.Ct. 2997. Corporations, which do not possess private lives to begin with, must similarly be denied full protection from libel. Stated another way, the "public figure" standards set out in *Gertz* are designed to ascertain whether a person, through his activities, has lost claim to his private life. It makes no sense to apply these standards to a corporation, which, regardless of its activities, never has a private life to lose.

The conclusion that the type of private controversies the Court sought to protect in *Gertz* were those of a highly personal nature, and not the type which could be associated with corporate activity is strength-

ened by the recently decided *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). The Court there held that publication of details concerning Mrs. Firestone's divorce could not be shielded by the malice standard because that very personal action was not a legitimate subject of public debate and was known to the general public only because society demanded that Mrs. Firestone go to court to dissolve the marriage. No event in the life of a corporation involves such sacred personal events as marriage and divorce.

It is, of course, true, that corporations suffer from defamatory publications and are afforded limited relief by the states. Thus, it remains for the court to determine how to accommodate the state's interests in protecting corporate reputation with the fundamental interests embodied in the first amendment. As stated above, corporations are similar to public figures in that neither have private lives. It would be possible to hold, then, that the malice standard applies to any libel action brought by a corporate plaintiff. However, such a holding would not be entirely just, since implicit in the public figure concept is the conclusion that society is somehow interested in the plaintiff and his activities. The court is of the opinion that corporations can be afforded a similar protection by following the plurality rule in *Metromedia,* that the malice standard applies only where issues of legitimate public concern are discussed. This approach grants some deference to the values underlying corporate libel actions grounded in state law, while at the same time resulting in only a minor encroachment on the first amendment, which was designed primarily to defend the market place of ideas. It is, therefore, the holding of this court that actual malice must be proven with convincing clarity in any libel action brought by a corporation against a mass media defendant, if the defendant establishes that the publication in issue concerned matters of legitimate public interest.

■ Applying the standard to the instant case, the court concludes that Martin Marietta must prove that the *Star* published the October 31 article with actual malice. The article, and the series of which it was a part, concerned the use of various forms of entertainment by defense contractors to influence the award of defense contracts. Surely, these are matters of legitimate public interest. Further, the alleged activities involved possible violations of an Executive Order and Defense Department Regulations, thus making them a legitimate public concern, per se. Plaintiff argues that the article was not about defense contractor activities but about a private party given by friends of an Air Force official. It may or may not be true that this party was wholly private in nature, but that is not the issue here. The article characterized the party as defense contractor sponsored entertainment, thereby placing it in the context of a public controversy.

### B.

*Application of the Public Figure Standard*

■ In the preceding section of this Memorandum, the court concluded that corporations are excluded from the zone of protection carved out by the majority opinion in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and that it is not necessary to apply to corporations the standards set out in the opinion for determining whether a libel plaintiff is a public figure. If however, higher courts, which have yet to consider the problem, should find it necessary to fit corporate plaintiffs into this ill-fitting mold, this court concludes that Martin Marietta is a public figure for the purposes of the instant action and, consequently, must prove actual malice.

In *Gertz,* the Court delineated two categories of public figures: public figures for all purposes and public figures for a limited range of issues. The Court stated,

> For the most part those who attain [public figure] status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes.

More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

*Id.* at 345, 94 S.Ct. at 3009.

■ Whether or not plaintiff can be considered a public figure for all purposes, it clearly is a public figure for the range of issues discussed in the October 31 article. Plaintiff's theory for evading this classification is to assert that the article concerned only a private stag party and that Martin Marietta refused to thrust itself into this controversy. As indicated above, however, the article is properly considered as discussing the entertainment of Pentagon officials by defense contractors for the purpose of influencing the distribution of defense contracts. Martin Marietta, as the nation's 20th largest defense contractor, was surely in a position "to influence the resolution of the issues involved." Indeed, plaintiff constantly attempted to improve its position by entertaining military personnel and maintaining facilities such as the Maryland hunting lodge for this purpose. The numerous articles linking Martin Marietta with entertainment and the Northrop scandal provide ample evidence of plaintiff's public association with the issue. Also, Martin Marietta, which regularly distributes news releases through 317 outlets in the United States and Canada, and which issued a release on the article giving rise to this case, fits the *Gertz* description of a public figure as one with access to the media. *See* 418 U.S. at 344, 94 S.Ct. 2997.[8]

The Supreme Court's examination of the public figure doctrine in *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), reinforces the conclusion that Martin Marietta is a public figure for the purposes of this lawsuit. In *Firestone*, the Court placed special emphasis on the requirement that a party voluntarily thrust itself into a controversy and it made clear that the controversy with which plaintiff is associated must be of legitimate interest to the public. *Id.* at 454, 96 S.Ct. at 965. Both these requirements are met in the instant case.

The issues raised by the October 31 article are undoubtedly of legitimate public interest. Both as taxpayers and as citizens in a democracy the public has an interest in the manner by which defense contracts are awarded. In addition, the prospect that the activities described in the article constituted violations of an Executive Order and Defense Department regulations creates a legitimate public controversy. Unlike *Firestone*, the instant case does not involve deeply personal events in the life of the plaintiff.

It is also clear that, unlike Mrs. Firestone, plaintiff was not forced to enter this controversy, but jumped in with both feet. Plaintiff has many interests other than the defense industry, but chooses to compete for defense contracts. It also chooses to entertain persons connected with the military. These wholly voluntary acts place plaintiff in the center of the controversy explored in the October 31 article and the series of which it was a part.[9]

---

**8.** Plaintiff offers a Roper poll to dispute the finding that it is a public figure for the issues raised by the October 31 article. It relies primarily on the facts that seven percent of the sample associated Martin Marietta with defense contracting, while one percent associated a fictitious corporation with defense contracts. Assuming for the purposes of this motion that the poll would be admissible at trial, the court does not find the results to create a triable issue of fact. A seven percent response is rather high, when it is considered that most individuals or corporations would register little recognition at all. More seriously, plaintiff fails to realize that *Gertz* does not require a

public figure for limited issues to be notorious, but merely to be in a position allowing him to influence the resolution of the issue. *See* 418 U.S. at 345, 351, 94 S.Ct. 2997. The record clearly shows that Martin Marietta was in a position to influence the issues discussed in the October 31 article.

**9.** Another possible ground for applying the malice standard in the instant case is that it is required by the law of the District of Columbia. Since this is a diversity action, the substantive libel law applied by this court must be that of the District. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see Luck v. Baltimore and Ohio R.R.*, 352 F.Supp. 331

## III

### Application of the Malice Standard

The Supreme Court, in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), defined actual malice as publication of a story "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726. The Court also required that malice be proved with "convincing clarity." *Id.* at 285–86, 84 S.Ct. 710. The Court further elaborated on the definition of malice in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), where it stated that recklessness consists not of mere negligence, and not of gross negligence, but of publication with actual doubt as to the story's accuracy. According to the Court,

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

*Id.* at 731–32, 88 S.Ct. at 1325.

■ There can be no doubt that, as of the first publication of the story, the *Star's* employees firmly believed in its truthfulness of the article. Prior to the first appearance of the article, Editor Cohen went over the details with Gruenstein and satisfied herself as to its accuracy. In those areas where she entertained doubts as to accuracy, she modified the article. Cohen based her opinion that the story was accurate on the past reliability of Gruenstein, especially with regard to a recent series of entertainment of Pentagon officials by defense contractors, on a similar, but more vague, article in the *Washington Post*, a statement by Secretary of Defense Schlesinger that such activities were commonplace in the defense industry, and on the specific evidence alluded to by Gruenstein. Epstein and Bellows justifiably relied on Cohen's judgment.

■ Plaintiff criticizes the adequacy of Cohen's pre-publication investigation in many respects, but the criticism can, at best, establish simple negligence.[10] As *St. Amant* makes clear, negligence is not recklessness and cannot support a finding of actual malice. 390 U.S. at 731, 88 S.Ct. 1323. Plaintiff makes much of language in *St. Amant* indicating that recklessness could be found where allegations are "so inherently improbable that only a reckless man would have put them in circulation." *Id.* at 732, 88 S.Ct. 1323. However, given the factual backdrop of the article, including Secretary Schlesinger's statement, the allegation that a defense contractor entertained Pentagon officials at a hunting lodge and provided prostitutes cannot be considered "inherently improbable."

Plaintiff relies principally on *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), where the majority extended the *New York Times* rule requiring evidence of actual malice to public figures, but held that the allegedly defamatory article was published with reckless disregard for its truthfulness. Although the Court based this conclusion on a finding that the publisher's investigation was "an extreme departure from the standards of investigating and reporting," *id.* at 158, 87 S.Ct. at 1993, a charge similar to that leveled by plaintiff against the *Star*, the facts underlying this finding were substantially more severe than those in the instant case. First, it was clear to all con-

---

(D.D.C.1972). At least one Superior Court Judge has held that the appropriate degree of fault to be proven in libel cases is actual malice, when public issues are involved. *See Hatter v. Evening Star Newspaper Co.,* Civil Action No. 8298–75 (Sup.Ct.D.C. March 15, 1976). Because the issue was not briefed and alternative grounds are available, the court need not reach the question.

10. Many of the key weaknesses in Cohen's investigation pointed out by plaintiff are not really failings on her part, but failures by Gruenstein to be completely candid. Cohen can hardly be held responsible for Gruenstein's misstatements. If anything, they strengthen her position since they allayed any doubts she may have had about the article.

cerned that the article, which appeared in the *Saturday Evening Post* and which accused Wally Butts, head football coach at the University of Georgia, of disclosing game strategy to the opposing team, would instantly destroy his reputation and his ability to earn a living whether or not it was false. The *Post* also knew that its informant, who claimed to have overheard Butts' telephone conversation with the opposing team's coach, was convicted of passing bad checks. Yet, the *Post* made no efforts to verify his story. This failure to verify included decisions not to interview a person named by the informant as a witness to the incident and not to screen the game films to see if they indicated that the opposition was privy to Georgia's strategy. Further, the Court noted that expert testimony established that the notes of the alleged phone call supplied by the informant did not contain any valuable strategic information and that the article's author was not a football expert. In addition, the writer's assistants were already involved in a libel action filed by the coach of the opposing team. The Court also noted that the article was not "hot news" and that, consequently, the publisher had all the time it needed to conduct a thorough investigation. Finally, the Court indicated that the *Post* may have purposefully kept its investigation at a superficial level because the article fit perfectly its new image of "sophisticated muckraking." *See id.* at 157–58, 87 S.Ct. 1975.

The case at bar is distinguishable from *Butts* on virtually all the factors set out above. While the charges leveled against Martin Marietta are serious, they hardly rise to the magnitude of the *Post* article. Wally Butts was ruined, but Martin Marietta has seemingly sustained damages so imperceptible that counsel is not yet able to evaluate them. In addition, the *Star's* "source" for the October 31 article was not a convicted felon, but a reporter of proven

reliability, especially on the topic involved. Finally, it is apparent that once Gruenstein, independently of the *Star*, decided to distribute the article, a "hot news" situation prevailed.[11]

■ Plaintiff contends that the *Butts* case controls here because the *Star*, like the *Post*, has embarked on a rampage of "sophisticated muckraking" in an effort to bolster its tenuous financial position. Plaintiff's evidence and proffered evidence on this point is not convincing, but, in any event, the court regards this as perhaps the least important factor relied on in *Butts*, and would not find it to create a jury question on the malice issue, even if convincingly proved.

■ The fact that Gruenstein, an independent reporter of proven reliability, authored the October 31 article not only illustrates that the *Star's* conduct meets the standard set out in *Butts*, but indicates that the *Star's* conduct should properly be judged by a much lower standard. In *Washington Post Co. v. Keogh*, 125 U.S. App.D.C. 32, 365 F.2d 965 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), the Court of Appeals for the District of Columbia Circuit affirmed the granting of summary judgment for the *Washington Post*, which was being sued for the publication of a Jack Anderson column. Noting that the expense and burden of verifying syndicated columns coupled with the slim amount of time available before printing would inhibit publication of sensitive articles, the court stated that failure to verify could not result in liability for defamation "in the absence of evidence that the publisher had good reason to suspect falsity." *Id.* at 972–73. Plaintiff fails to prove that the *Star's* belief in the October 31 article was not reasonable. As the *Keogh* court noted, "[A] publisher has reason to suspect a publication's accuracy where he knows or should know that the author or

---

11. Plaintiff, relying on a statement in the deposition of Bellows, contends that the *Star* was not confronted with a hot news situation. *See* Bellows Dep. 7. The statement, however, refers to discussions taking place at the Tuesday Editor's meeting. *Id.* The situation changed substantially on Thursday, when Gruenstein released the article to his subscribers and at least two other papers besides the *Star*.

endorser is *persistently* inaccurate." *Id.* at 971 (emphasis added). Plaintiff has made no showing at all of persistent inaccuracy by Gruenstein. The record is to the contrary.

██ Plaintiff argues that defendant does not fall within the holding of *Keogh* because it rewrote the article, thus making the article its own, rather than Gruenstein's. Plaintiff cannot seriously contend that the *Star* rewrote the entire article, since, aside from the addition of several paragraphs, editing was limited to improving style and did not result in substantive changes. The *Star* is responsible for the material added to the article, *see Buchanan v. Cronkite,* Civ. Action No. 1087–73 (D.D.C. July 18, 1975), but the record shows none of the additions to be published with knowledge of falsity or recklessness. Certainly, the additions to the body of the article, consisting of general background information on the subject of entertaining government officials, were printed without malice. Of the two remaining additions, one, the headline, is an accurate reflection of the article's contents. The last addition is the promotion blurb, which plaintiff contends is false because it refers to stag parties when the article spoke only of one party. Plaintiff neglects to mention, however, that the promotion blurb makes no mention of Martin Marietta and that the article itself plainly associates Martin Marietta with but one party. In any event, the blurb is not false because while only one party is described in depth, the story makes reference to similar conduct on the part of other defense contractors.

██ Plaintiff maintains that if the *Star's* initial investigation does not establish malice, the *Star's* response to George Bunker's phone call does. According to plaintiff, the phone call places the case within the holding of *Airlie Foundation, Inc. v. Evening Star,* 337 F.Supp. 421 (D.D.C.1972). In *Airlie,* the *Star* printed an article repeating charges made by an individual at a press conference that plaintiff was secretly funded by the CIA. After one issue appeared, the Editor of the *Star* called the Director of the CIA. The Director informed him that the CIA did not fund the plaintiff. The *Star* not only continued to run the article, but changed it to include facts not provided in the news conference and which it knew to be false. Specifically, the *Star* printed that the CIA had not denied the story, knowing full well that the Director had personally called to do so. The story also implied that the foundation had a secret bugging system installed, when the truth was known to be that an audio system existed, but was fully visible to anyone in the building and served a legitimate communication function. On the basis of this evidence, Judge Oliver Gasch held that the jury could have inferred that the *Star* knew of the falsity of the article when it was published. *Id.* at 427–28. Judge Gasch did not hold that the *Star* was reckless or that the phone call per se should have killed the story.

The instant case differs from *Airlie* in many ways, not the least of which are that Bunker initiated the contact rather than the *Star* and that Bunker was associated with the plaintiff, rather than a third party. If potential plaintiffs in libel suits could cut off a malice defense simply by calling a newspaper and giving a broad denial of an article, the first amendment policy embodied in *New York Times* would be undermined. In light of the attempts at verification, the lack of detail provided in the denial, and the previous successes with similar articles, the *Star* was entitled to continue believing in the article. Also unlike *Airlie,* where the *Star* not only failed to print the CIA denial but stated that no denial was made, the October 31 article included a denial from a Martin Marietta officer and the *Star* offered to print further denials and explanations by Martin Marietta, but was refused. Finally, unlike *Airlie,* there is no evidence in the instant case that the *Star* knew any material information in the article to be false.

Defendant's conduct following Bunker's call also comports with *Curtis Publishing Co. v. Butts, supra.* At the time Bunker called Epstein, deadlines for the remaining

issues of the *Star* were only hours away, placing defendant in a "hot news" situation. Thus, the rigorous standards by which the Court judged the *Post* in *Butts* cannot be applied to defendant's conduct immediately after the call. A further limitation on the application of *Butts* to defendant's conduct during this time frame is that Gruenstein, as a nonemployee, was not directly under defendant's control and could not be available immediately for detailed verification. In this light, defendant's conduct was eminently reasonable. Epstein conferred with Cohen, the one Star employee most familiar with the piece and assessed the credibility of Bunker's broadside denial. Whether the ensuing decision to leave the article in remaining editions was right, prudent, or fair, it was not malicious.

Plaintiff's last argument with regard to the existence of malice is that no decision can be made until further discovery is permitted. The discovery plaintiff wished to engage in is outlined in its memorandum opposing defendant's motion for a protective order and in a recently-filed document entitled "Plaintiff's Request For A Conference With The Court To Establish A Schedule For Further Discovery." Plaintiff's request must be denied because it fails to recognize that malice is not mere bad feeling, but actual knowledge of falsity or doubt as to accuracy. Plaintiff also fails to realize that evidence already in the record so proves an absence of malice that mere speculation as to the existence of other potential evidence or the proffer of marginally relevant data cannot delay summary judgment.

The record already established, and the further requests of plaintiff, show conclusively that all persons directly connected with the publication of this article have been fully deposed. The persons plaintiff now wishes to depose were so far removed from the action that they could not possibly create a dispute as to facts already produced by the principal actors. Indeed, it becomes clear that plaintiff's concept of relevance is so broad that it will never be satisfied. The most recent group of persons plaintiff announced a desire to depose were all known to counsel at the time the memorandum opposing the protective order was filed and at the time of oral argument on this motion, when the court requested a detailed listing of discovery necessary to complete the record. Yet, it was not until several weeks later that plaintiff made a desire to depose this group known.

As a general proposition, courts should not delay the granting of summary judgment where, as in the case at bar, the existing record removes all doubt as to the verdict and the losing party's attempts at further discovery would be mere shots in the dark. *See Epoch Producing Corporation v. Killiam Shows, Inc.*, 522 F.2d 737, 742–43 (2d Cir. 1975); *Applegate v. Top Associates, Inc.*, 425 F.2d 92, 96 (2d Cir. 1970). The general rule applies with even more force in a libel action, where the very institution of the suit itself inhibits the performance of the press. *See Washington Post Co. v. Keogh, supra.*

## IV

### Vicarious Liability

Plaintiff argues that regardless of its independent liability, the jury could find the *Star* liable for Gruenstein's acts on a respondeat superior theory. *See Cantrell v. Forest Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974). The record establishes beyond peradventure that Gruenstein never was on the *Star* payroll and that the *Star* did not subscribe to CHNS. Plaintiff would nevertheless find Gruenstein to be the *Star's* agent because (1) Cohen gave him specifications for the article, (2) Cohen let him use the *Star* morgue for research purposes and (3) the *Star* paid him $200 for the piece. Plaintiff cites no case where such a tenuous relationship between a writer and a publisher resulted in imposition of liability on the publisher, and, in any event, the alleged factual predicate is incorrect.[12]

---

12. Plaintiff also relies on a message slip, written after institution of this action indicating that a caller named Gruenstein identified himself as a reporter for the *Star*. This lone inci-

Cohen did not give specifications for the article or even suggest that inquiry be made into the area. Rather, Gruenstein independently began an investigation and, as it neared fruition, followed the usual procedure of asking the *Star* whether it would be interested in the article. Plaintiff's description of the payment is also inaccurate since the money went to CHNS, Gruenstein's employer, and not into his pocket. The record shows the payment to be consistent with prior payments for similar articles.

An appropriate judgment accompanies this Memorandum. The judgment will be entered forthwith since the court has determined that there is no just reason for delay. See Fed.R.Civ.P. 54(b).

### APPENDIX A

### ARTICLE PUBLISHED BY DEFENDANT STAR

A number of Pentagon officials were guests at a weekend-long "stag" party for which two prostitutes were hired—at a hunting lodge leased by a major defense contractor, sources say.

The weekend party was held, according to three guests, in January, 1968, at a Wye Island, Md., hunting facility then leased by the Martin Marietta Corp., the nation's 26th-largest defense contractor. About one-third of the 40 to 50 guests at the affair—a bachelor's party for a top Air Force official about to be married—were Defense Department personnel. The remaining guests were from industry and other government agencies.

One of the two prostitutes was paid $3,000 in cash for her weekend's work by a Martin Marietta representative, according to one source.

A Martin Marietta spokesman said: "We don't find any record that any Martin employees were present or involved in the arrangement.

dent fails to create a triable issue in the face of other evidence in the record, including several

"My impression was it (the party) was at least two years after we had any connection" with the lodge, the spokesman, Martin Marietta Vice President Roy Calvin, said in answer to a query.

THE DISCLOSURE of the weekend party is the latest in a series of reports of the entertainment of Pentagon personnel by defense contractors. Some of the disclosures, including reports by Capitol Hill News Service that Pentagon officials have been guests at contractors' hunting lodges, have triggered investigations by Congress and the Defense Department.

Defense Secretary James Schlesinger said at a press conference Oct. 20 that he suspects the disclosures are only "the tip of the iceberg."

The entertainment of Pentagon officials at contractors' lodges apparently violated an executive order signed by President Lyndon B. Johnson in 1965, which expressly forbade Pentagon employees to accept anything of value from firms doing business with the Defense Department. A subsequent department directive interpreting Johnson's order said it prohibited, among other gifts, ". . . accommodations of [sic] hospitality given to or extended on behalf [sic] of the recipient."

Martin Marietta, a Maryland-based firm leased the Wye Island facility on Maryland's Eastern Shore through March of 1968 from owners Frank and William Hardy. Since then, the facility has been leased by Rockwell International.

A Rockwell spokesman said that no such party had been held at the facility since the Pittsburg-based firm began leasing it.

ONE VISITOR described the Martin Marietta party as "like summer camp, except everybody was over 35 and the awards committee didn't give out little medals but the two women."

The party began on a Friday night, although most of the guests arrived by bus Saturday morning. It ended late Sunday.

message slips from the period predating the suit identifying Gruenstein as a CHNS reporter.

The facility—commonly referred to as the Wye Island Gun Club—consisted of one lodge with a living room and three bedrooms and two or three smaller nearby cottages, according to the sources. Backwater and a field for hunting were located near the living quarters.

None of the guests hunted over the weekend, sources said, but a bar was set up under a tree on both Saturday and Sunday. One guest described the atmosphere as "sort of a reunion with a lot of backslapping and stuff."

During the day, the guests played cards and touch football and had a lunch of cold cuts. Some were entertained by the two women.

IN THE EVENING, the guests gathered in the living room of the main lodge. At one point during the evening, one of the women reportedly swung naked from the antlers of an animal head mounted on one of the lodge's walls.

Capitol Hill News Service also has learned from various sources that other defense contractors have paid prostitutes in recent years to entertain at functions at which Pentagon employees have been guests. In at least a few cases, goose-hunting guides have supplied prostitutes, sources said.

One McDonnell Douglas employee familiar with the practice also said that, in some cases, prostitutes have been procured by industry for traveling military officials through hotel bell captains.

Capitol Hill News Service also has reported that a number of Pentagon officials have been guests at a Northrop Corp. hunting lodge in Easton, Md., and that two other defense contractors—Rockville and Raytheon Co.—had entertained Pentagon officials on Maryland hunting trips.

## APPENDIX B

## ARTICLE SUBMITTED BY DEFENDANT GRUENSTEIN

WASHINGTON—A number of Pentagon officials were guests at a weekend-long "stag" party—for which two prostitutes were hired—at a hunting lodge leased by a major defense contractor, Capitol Hill News Service has learned.

The weekend party was held, according to three guests, in January, 1968, at a Wye Island, Md., hunting facility then leased by the Martin Marietta Corp., the nation's 26th largest defense contractor. About one-third of the 40 to 50 guests at the affair—a bachelor's party for a top Air Force official—were Defense Department personnel. The remaining guests were from industry and other government agencies.

One of the two prostitutes was paid $3,000 in cash for her weekend's work by a Martin Marietta representative, according to one source.

A Martin Marietta spokesman said: "We don't find any record that any Martin Marietta employees were present or involved in the arrangement. My impression was it (the party) was at least two years after we had any connection" with the lodge, Roy Calvin, a Martin Marietta vice president, said in answer to a query.

Martin Marietta, a Maryland-based firm leased the Wye Island facility on Maryland's Eastern Shore through March of 1968 from owners Frank and William Hardy. Since then, the facility has been leased by Rockwell International.

A Rockwell spokesman denied that such a party had been held at the facility since the Pittsburg-based firm began leasing it.

In recent years, Martin Marietta has rented a hunting lodge in Whittman, Md., owned by retired three-star Army Gen. William Quinn, a former vice president of the firm.

It is not known whether any costs associated with the Wye Island hunting facility have been billed to the government. Defense auditors have charged that the Northrop Corp. billed—and was routinely reimbursed by—the government for at least $24,000 related to its Easton, Md. hunting lodge.

One visitor described the party as "like summer camp, except everybody was over

35 and the awards committee didn't give out little medals but the two women."

The party began Friday night, although most of the guests arrived by bus Saturday morning. It ended late Sunday.

The facility—commonly referred to as the Wye Island Gun Club—consisted of one lodge with a living room and three bedrooms and two or three smaller, nearby cottages, according to the sources. Backwater and a field for hunting were located near the living quarters.

None of the guests hunted over the weekend, sources said, but a bar was set up under a tree on both Saturday and Sunday. One guest described the atmosphere as "sort of a reunion with a lot of backslapping and stuff."

During the day, the guests played cards and touch football and had a lunch of cold cuts. Some were entertained by the two women.

In the evening, the guests gathered in the living room of the main lodge. At one point during the evening, one of the women reportedly swung naked from a stuffed moose head on one of the lodge's walls.

In an investigation, Capitol Hill News Service has also learned from various sources that a number of other defense contractors have paid prostitutes in recent years to entertain at various functions at which Pentagon employees have been guests. Prostitutes have been hired for: hospitality suites at different military association meetings, as well as at Touchdown Club banquets held here annually in January, Washington suites leased by some defense firms, and, occasionally, at hunting parties. In at least a few cases, goose hunting guides have supplied prostitutes, sources said.

One McDonnell-Douglas employee familiar with the practice also said that, in some cases, prostitutes have been procured for traveling military officials through hotel bell captains.

Executive Order 11222, singed [sic] by President Lyndon Johnson in 1965, and Defense Department directives strictly prohibit Pentagon employees from accepting anything of value from firms doing business with Defense. The gift prohibitions also apply to other federal employees.

Following reports by Capitol Hill News Service that a number of Pentagon officials have been guests at a Northrop Corp. hunting lodge in Easton, Md., congressional and Pentagon investigations were recently launched. Defense Secretary James Schlesinger said at a press conference on Oct. 20 that he suspected the Northrop hunting disclosures were only "the tip of the iceberg."

Last week, Capitol Hill News Service reported that three other defense contractors —Rockwell, Martin Marietta and Raytheon Co.—had also entertained Pentagon officials on Maryland hunting trips.