**Richard V. SECORD, Plaintiff,**

v.

**Leslie COCKBURN, et al., Defendants.**

**Civ. A. No. 88–0727–GHR.**

United States District Court,
District of Columbia.

Aug. 27, 1990.

MEMORANDUM DECISION
AND ORDER

REVERCOMB, District Judge.

The plaintiff, retired Major General Richard V. Secord, filed the instant libel action against the defendants Leslie Cockburn, Andrew Cockburn, Morgan Entrekin, Atlantic Monthly Press, and Little, Brown and Company, Inc., arising out of the writing, publication and distribution of a book entitled *Out of Control: The Story of the Reagan Administration's Secret War in Nicaragua, the Illegal Pipeline, and the Contra Drug Connection* (1987) (hereafter *"Out of Control"*). This matter is before the Court pursuant to the defendants' motion for summary judgment.

## I. Subject of the Suit

*Out of Control* is a book about the purported activities of a group of Americans that supported the movement of the Contras to overthrow the Sandinista government in Nicaragua. The plaintiff contends that *Out of Control* identifies him as a member of a "secret team" which had engaged in illegal drug trafficking, torture, murder and attempted assassination as part of its conspiracy to overthrow the Sandinista government. The plaintiff broadly alleges that "the entire text of *Out of Control* defames him." *Statement of Points and Authorities in Support of Plaintiff's Motion in Opposition to Defendants' Motion for Summary Judgment* (hereafter *"Plaintiff's Opposition"*) at 27. Notwithstanding such a broad allegation of defamation the plaintiff isolates the gravamen of his complaint to three specific areas. First, the plaintiff contends that *"Out of Control* states to the average reader that General Secord participated in, facilitated, acquiesced in or condoned an attempt to assassinate [Contra leader] Eden Pastora at La Penca in May, 1984." [1]

Thomas C. Green, Sharp, Green & Lankford, W. Michael Kramer, Kramer & Associates, Michael P. McDonald, Center for Individual Rights, Washington, D.C., for plaintiff.

Floyd Abrams, Dean Ringel, Steven Lieberman, Adam Liptak, Cahill Gordon & Reindel, New York City, Rand McQuinn, Cahill Gordon & Reindel, Washington, D.C., for defendants Morgan Entrekin, Atlantic Monthly Press and Little, Brown and Company (Inc.)

John Taylor Williams, Palmer & Dodge, Boston, Mass., of counsel for defendant Little, Brown and Company (Inc.).

Michael Kennedy, New York City, for defendants Leslie Cockburn and Andrew Cockburn.

1. The specific passage in *Out of Control* to which the plaintiff cites provides:

Shackley and Clines were, however, besmirched enough by their associations with Wilson to be forced to resign from the CIA by Stansfield Turner in 1979. They thereupon joined forces with two people whose names were to become well known to Sheehan and, much later, to the press and public: Richard Secord, at the time an active general officer in the U.S. Air Force, and the Iranian-born arms dealer Albert Hakim.

*Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue Pursuant to Local Rule 108(h)* (hereafter *"Plaintiff's 108(h) Statement"*) at ¶ 9. Second, the plaintiff contends that *"Out of Control* alleges that General Secord participated in, facilitated, acquiesced in or condoned the illicit purchase, transportation and sale of cocaine, opium and other illegal drugs and in drenching America in cocaine and other narcotics."[2] *Id.* at ¶ 13. Third, the plaintiff contends that *"Out of Control* states and conveys to an average reader that General Secord participated in, facilitated, acquiesced, or condoned massive bribery of government officials in Iran and unconscionable profiteering in United States weapon sales to Iran."[3] *Id.* at ¶ 16.

The plaintiff concedes that *Out of Control* does not explicitly charge him with engaging in drug trafficking for personal profit. Rather, the plaintiff contends that the book "clearly conveys to the average reader the message that I would stand by and condone such activities within my organizations." *Affidavit of Richard V. Secord* at ¶ 35.

> According to the intelligence officer's story, this group began shipping arms, ammunition, and explosives to the remnant of Somoza's National Guard immediately after they escaped from Nicaragua and began to reform themselves as the contras. Later on, the same cast of characters, employing Quintero among others, delivered lethal supplies to contras in Costa Rica, in part through John Hull. In fact it appeared that this group had been the main suppliers of the contras from 1979 through 1980, and again from 1984 to 1986, during the official cutoff of U.S. assistance.
>
> Sheehan realized he was now getting very close to the background to La Penca. Indeed, he was told that a close associate of Quintero's, a man by the name of John Harper, had actually given a course in Honduras on the construction of bombs identical to the one used at La Penca.

*Out of Control* at 96–97.

2. The plaintiff generally cites to the chapters in *Out of Control* entitled "The Cocaine Connection" at pages 152–167 and "Guns for Drugs" at pages 168–188. More specifically, the plaintiff challenges the following passages:

> Scandalous though the use of Hull's strips for drugs and arms may seem, there was another airfield in Costa Rica reportedly being used for drug trafficking, one that puts Oliver North and his associates in even closer conjunction with the narcotics business. The secret airfield at Santa Elena authorized by North and Secord, promoted by Ambassador Tambs, scouted by Station Chief Fernandez and Robert Owens and Rafael Quintero was also, according to several sources, a transshipment point for cocaine.
>
> \* \* \* \* \* \*
>
> Seal told [Mickey Tolliver] that not only would the flying be interesting, the pay would be good too. He told Tolliver to go to Miami and call a particular number. The interesting flying, thought Tolliver, could be "anything from Campbell's soup to dead babies, but knowing Seal, it involved drugs." He had no idea however that he was stepping into the middle of the secret contra supply network, and that his control agents would include, according to Tolliver, at least one high-level operative in the North–Secord–CIA operation: Rafael Quintero.

*Out of Control* at 177–78, 180.

3. The book provides:

> In 1976 Richard Secord turned up in Tehran, posted to run the air force component of the U.S. Military Assistance Advisory Group, the main function of which was to advise the shah to buy lots of expensive American weapons. Weapon sales promoted by Secord involved what one observer calls "some of the biggest bribery in Iran."
>
> The enormous U.S. weapons sales program to Iran was, in addition, marked by a huge disparity between the prices paid by the Iranians and what the U.S. military paid for identical equipment. This, as we shall see, was not the last time the Iranians were to be subject to such official profiteering. Secord's superior and partner in these efforts was Erich von Marbod, who had now become the senior U.S. defense representative to Iran.
>
> Handling bribes, or as he prefers to call it, baksheesh, was the specialty of a man whom Secord first met in Iran and who was to become the financial comptroller of Secord's complex business organization. Albert Hakim was a middleman who would receive bribe money from defense contractors to be paid to Iranian officials who were purchasing the weapons. Not all the money would pass out of his control, however. As he later testified to the Iran–Contra committees, Hakim was trusted by the shah's generals to invest their ill-gotten gains in Switzerland, in accounts untraceable to the true owners of the money.
>
> It was in this period that the network began to set up its own proprietaries, as private companies owned by the CIA are called. Some of these were to become famous when the Iran–Contra scandal finally burst on America. They included the Stanford Technology Corp. and Energy Resources. Others, such as CSF Investments Ltd., were specifically Central American in their orientation. This was hardly a coincidence, for in 1978 the network had made a new and fateful connection.

*Out of Control* at 105.

See generally *Plaintiff's Opposition* at 27–31; *Plaintiff's Amended Complaint* at ¶ 12.

## II. *Elements of Libel Action*

■ In order to prevail in a libel suit the plaintiff must demonstrate that the statements complained of are (1) defamatory, (2) false, (3) statements of fact (and not opinion), and (4) made with the requisite degree of fault. *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293 (D.C.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). The statements in question must be "of and concerning" the plaintiff. *Summerlin v. Washington Star Co.*, 7 Media L. Rep. (BNA) 2460 (D.D.C.1981). In addition, the passages will not be actionable if subject to certain common-law privileges, as for example the privilege for publication of accurate reports of official governmental proceedings. *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88 (D.C.1980).

This Court focusses only on the issue of whether the statements were made with the requisite degree of fault. Although this Court expresses some serious doubt whether much of what plaintiff cites to in *Out of Control* is even of a defamatory nature of and concerning the plaintiff, this Court reaches only the issue of whether the statements were published with the requisite degree of fault in light of the October 5, 1989 status hearing and Order in which this Court established a briefing schedule for a dispositive motion on this basis pursuant to the parties' agreement.

## III. *Degree of Fault: Public Figure and Actual Malice*

A public figure can prevail in a defamation suit only by proving the defendant's "actual malice." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). More fully,

> Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.

*Gertz*, 418 U.S. at 342, 94 S.Ct. at 3008.

### A. *Public Figure*

■ A review of the plaintiff's military career and his role in attempting to influence fundamental issues of this country's military and foreign policy illustrates his status as a public figure. The plaintiff testified in his deposition that he served as a general officer in Iran. According to plaintiff, "[g]eneral officers are the senior executives and are much more involved in management ... than in hands-on operations." *Secord Deposition (I)* (attached as exhibit 1 to *Ringel Affidavit*) at 37. The plaintiff provided that "[g]eneral officers have great prestige" and are "sought after and highly competitive" positions. *Id.* Most fundamental, the plaintiff recognized that the general officers "[a]bsolutely" hold an important public trust. *Id.* at 37–38.

The plaintiff then served as Director of International Programs for the Air Force, *id.* at 43–44, and as Deputy Assistant Secretary of Defense. *Id.* at 55. In regard to the latter position, the plaintiff described it as "a policy level assignment ... responsible to an assistant Secretary of Defense who was in turn responsible to the Secretary of Defense." *Id.* at 56. The plaintiff characterized the assignment of Deputy Assistant Secretary of Defense as a "high profile job." *Id.* at 57.

After leaving active service in May 1983, plaintiff was one of ten or so general or flag officers appointed by the Secretary of Defense to serve on the Special Operations Policy Advisory Group which "advise[d] the Secretary of Defense on special operations matters that the Secretary thinks are of importance." *Id.* at 58–59.

The plaintiff also represented the government of the United States as "an emissary authorized by the President" in connection with negotiations with the Irani-

ans. *Id.* at 62–63. In this role the plaintiff on one occasion conveyed thanks directly from the President to the Prime Minister of Israel for assistance that the Prime Minister had rendered. *Id.* at 63.

The plaintiff later voluntarily assumed a position of responsibility as head of the "Enterprise" in connection with the Iran–Contra initiative. The plaintiff testified that he "exercised overall control" over the "Enterprise" which "is the group of companies that Mr. Hakim formed to manage the Contra and the Iranian project." *Testimony by Richard Secord in Iran–Contra Hearings* (attached as exhibit 9 to *Leslie Cockburn Affidavit*) at 172.

■ As the Supreme Court defined "public figure":

> For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

*Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009. The above outline of the plaintiff's career demonstrates a man committed to effecting United States military and foreign policy by the assumption of highly influential positions. In summarizing the plaintiff's military career the following exchange occurred at his deposition:

> Q. Mr. Secord, you have talked about your career as a general, as an assistant secretary, deputy assistant secretary, as a principal emissary in a major diplomatic initiative, as commander of transportation to the Contras, your service on the SOPAG committee. *Is it fair to say that you have assumed a role of special prominence in the affairs of our country?*
>
> A. You can say that, I suppose.

*Secord Deposition (I)* at 78–79. Indeed, any individual who holds an advisory military or diplomatic position, or otherwise attempts to shape the policy of the United States, is by definition a public figure by the fact that the policy which the individual seeks to shape ultimately effects the public. *See MacNeil v. Columbia Broadcasting Sys., Inc.,* 66 F.R.D. 22, 25 (D.D.C. 1975) (colonel in United States Marine Corps is public official); *cf. Arnheiter v. Random House, Inc.,* 578 F.2d 804, 805 (9th Cir.1978) (per curiam), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979) (Navy captain removed from his position by his superiors who courted publicity to make his case a "cause celebre" is both public official and public figure).

Moreover, the plaintiff has appeared as a speaker at many political gatherings and has been interviewed on network television programs including *Nightline, Good Morning America* and *Cross–Fire* (the latter to discuss *Out of Control*) and in publications, including an extended *Playboy* interview, demonstrating "access to the channels of effective communication" that the Supreme Court felt characterized a public figure. *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009. *See Secord Deposition (I)* at 70–73; *Defendants' Statement of Material Facts as to Which There is No Genuine Issue Pursuant to Local Rule 108(h)* at ¶ 1.f.

Indeed, the plaintiff does not dispute that he is a public figure. In none of the papers that the plaintiff has filed with this Court in opposing the defendants' motion for summary judgment has he marshalled facts or developed argument to dispute the defendants' characterization or showing of the plaintiff as a public figure. In fact, in *Plaintiff's Opposition* he essentially concedes his public figure status by providing that "General Secord's activities in support of the Contra supply effort may render him a public figure for the purposes of this lawsuit ...." *Id.* at 3. Accordingly, this Court rules that the actual malice standard applies in the instant case where the plaintiff is a public figure.

### B. *Actual Malice*

■ In the summary judgment context, the nonmoving party's burden is to come forward with "sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). As a public figure, the plaintiff can survive the defendants' motion for summary judgment only if he can point to record facts from which a reasonable jury could find pursuant to the clear and convincing standard that the defendants published *Out of Control* with actual malice. *See id.* at 255–56, 106 S.Ct. at 2513–14; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162, 87 S.Ct. 1975, 1995, 18 L.Ed.2d 1094 (1967) (extending *New York Times* test to public figures).

As the U.S. Court of Appeals for the District of Columbia has recently reiterated in defining "actual malice":

> A [defendant] publishes an article with "actual malice" if it knowingly or recklessly disregards the truth. See *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). The standard is not satisfied even by proof of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Harte-Hanks [Communications, Inc. v. Connaughton*, — U.S. ——,] 109 S.Ct. [2678] at 2685 [105 L.Ed.2d 562 (1989)]. The inquiry is said to be ultimately a subjective one—"the defendant [must have] in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731,

88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). But, as is often true for inquiries into state of mind, proof may take the form of circumstantial evidence, such as the existence of "obvious reasons to doubt the veracity of the informant or the accuracy of his reports" or the inherent improbability of the reports. *Id.* at 732, 88 S.Ct. at 1326; *Harte-Hanks*, 109 S.Ct. at 2686.

*Clyburn v. News World Communications, Inc.*, 903 F.2d 29, 33 (D.C.Cir.1990).

### IV. Adequacy of Discovery

Prior to reviewing the record in the instant case, this Court must first address plaintiff's contention that there has been inadequate opportunity in which to fully discover facts on the issue of actual malice. The suggestion that the plaintiff has not been afforded a full opportunity in which to pursue discovery simply is not supported by the record. If the plaintiff claims that he has not been able to develop a full record then the fault lies only with the plaintiff and neither with the defendants nor this Court.

■ The plaintiff contends that more discovery is necessary in light of the "several stays" issued by this Court in this case. The fact of the record is that this Court issued a stay of discovery on June 21, 1988 because of its own concerns about the wisdom of plaintiff's proceeding with this action while criminal charges were pending against him.[4] However, the plaintiff apprised this Court that he wanted to secure "a prompt adjudication of his libel claim." *Opposition of Plaintiff Secord to Stay of Proceedings* at 8 (July 6, 1988).[5] Accord-

---

**4.** The plaintiff was indicted on Iran–Contra charges on the very day that he filed this libel action.

**5.** More fully, the plaintiff's opposition to the stay strongly concluded:

> We conclude with the observation that absent compelling circumstances, plaintiff Secord should not be deprived of a prompt adjudication of his libel claim. A stay will serve only to perpetuate the libel and its circulation at the expense of plaintiff's reputation. Libel is not a form of protected speech, and defendants should not be provided with an indefinite license to circulate for profit false

and outrageous accusations about plaintiff while only pretending to be hobbled in their ability to defend this case. Ms. Cockburn and her codefendants surely understood the risks involved in publishing ugly and unprovable allegations of criminal misconduct totally unrelated to the Iran/Contra affair. Undoubtedly they thought that plaintiff would be distracted by other concerns and not disposed to sue and that they could therefore exploit plaintiff's predicament with impunity. That strategy was ill-conceived, and it ought not to be rewarded with the imposition of an indefinite stay which would serve only defendants' objectives.

ingly, this Court accepted the plaintiff's position and vacated its stay on July 12, 1988. No other stay of discovery was imposed until the deadline for depositions of defendants (September 29, 1989) had passed. The plaintiff has had an unrestricted year and a half in which to pursue discovery in the instant case.

Plaintiff contends that he did not fully pursue discovery within this period because he had to devote his time and resources to defending his criminal charges. This was precisely one of the concerns of this Court in ordering the June 21, 1988 stay. However, by the fact that the plaintiff wanted the stay vacated, this Court and the defendants were entitled to assume that the plaintiff had sufficient ability to proceed with this case notwithstanding his pending criminal charges.

This Court understands that at the time when the criminal indictment came down the plaintiff could have miscalculated the amount of time and money that he would have to expend on his defense, but the plaintiff never, in the subsequent one-and-a-half-year period, apprised this Court or the defendants that the demands of defending his criminal charges were more than he anticipated and were undermining his efforts to vigorously pursue the instant civil case. Indeed, the first time that this Court became aware of plaintiff's failure to fully pursue discovery was in March 1990 at the time that he filed his opposition to the defendants' motion for summary judgment.

The plaintiff surely cannot claim surprise by the defendants' motion for summary judgment. At the status hearing in this matter on October 5, 1989 the defendants specifically apprised the plaintiff and this Court that they were intending to file a dispositive motion on the issue of actual malice. This Court accordingly established a briefing schedule, confirmed by Order, to which the defendants *and* the plaintiff agreed. Plaintiff did not inform this Court

at that status hearing that preparing for his criminal defense had impeded the prosecution of his civil case and that he would accordingly need more time in which to pursue discovery on the issue of actual malice.

■ This Court accordingly cannot accept the plaintiff's last-minute request for more discovery.[6] Summary procedures are of special importance in libel suits brought with respect to reports on the activities of public figures and public officials. As this Court has provided on previous occasions:

"In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the *Times* principle, in addition to protecting persons from being cast in damages in libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government."

*White v. Fraternal Order of Police*, 707 F.Supp. 579, 586 (D.D.C.1989) (quoting *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967)). At the same time, this Court of course recognizes that discovery must be exhausted before a court rules upon a dispositive motion for summary judgment. *See, e.g., Hutchinson v. Proxmire*, 443 U.S. 111, 120, 99 S.Ct. 2675, 2680, 61 L.Ed.2d 411 (1979); *Herbert v. Lando*, 441 U.S. 153, 159–61, 99 S.Ct. 1635, 1640–41, 60 L.Ed.2d 115 (1979). However, where a party fails to pursue discovery in the face of a court-ordered cutoff, as here, that party may not be heard to plead prejudice resulting from his own inaction. *Morrissey v. William Morrow & Co.*, 739 F.2d 962, 966 (4th Cir.1984), *cert. denied*, 469 U.S. 1216, 105 S.Ct. 1194, 84 L.Ed.2d 340 (1985). In the instant case the defendants' documents

*Id.* at 8–9.

**6.** Indeed, plaintiff's claim of a need for additional discovery does not even contain a specific factual proffer of what he expects to find. Rather, he asserts only general and conclusory

statements that he expects to find actual malice after more discovery. There has been no proffer on who or what the plaintiff will discover to find facts which can establish actual malice.

were made available for inspection pursuant to a Rule 34 document request and plaintiff was afforded a year and a half in which to depose all of the defendants. Although the plaintiff never deposed the publisher, Atlantic Monthly, the distributor, Little, Brown, or the principal editor, Morgan Entrekin, this Court notes that the plaintiff did depose Leslie Cockburn, the author of *Out of Control*, for two days, and Andrew Cockburn, an editor of the book, for one day.

### V. *No Record Facts of Actual Malice*

 Actual malice must be proved separately with respect to each defendant, *St. Amant v. Thompson*, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Hunt v. Liberty Lobby*, 720 F.2d 631, 648–49 (11th Cir.1983); *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947, 961–62 (D.D.C.1976), and cannot be imputed from one defendant to another absent an employer-employee relationship giving rise to *respondeat superior. Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 253, 95 S.Ct. 465, 470, 42 L.Ed.2d 419 (1974); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1446 (8th Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990).

### A. *Defendants Morgan Entrekin, Atlantic Monthly Press, and Little, Brown and Company (Inc.)*

The defendants Morgan Entrekin, Atlantic Monthly Press and Little, Brown and Company (Inc.) constitute the principal editor, the publisher, and the distributor of *Out of Control*, respectively. The moving parties' burden in a motion for summary judgment is simply showing—pointing out to this Court—that there is an absence of evidence to support the element of actual malice in the plaintiff's libel case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553 (burden

on moving party). The plaintiff can successfully oppose the defendants' motion for summary judgment only if he can establish that there is a genuine issue or dispute as to actual malice by pointing to record facts from which a reasonable jury could find by the clear and convincing standard that the defendants published *Out of Control* with knowing or reckless disregard for the truth. *Anderson v. Liberty Lobby*, 477 U.S. at 255–56, 106 S.Ct. at 2513–14.

 Plaintiff cannot rely upon the theory of *respondeat superior* to impute evidence of actual malice from Leslie Cockburn to these defendants because the undisputed facts in the record before this Court provide that the author is an independent contractor. *See Entrekin Affidavit* at ¶ 18; *Navarre Affidavit* at ¶ 8; *Hall Affidavit* at ¶ 2. The plaintiff has failed to point to a single fact in the record on whether Entrekin, AMP, and Little Brown each had personal actual knowledge of falsity or serious doubts as to the truth of *Out of Control.* In *Plaintiff's Opposition* the plaintiff does not include a section or any argument in opposition to the motion of defendants Entrekin, AMP and Little, Brown for summary judgment. *See* Local Rule 108(b) (court can treat a motion as conceded where the nonmoving party fails to serve and file a memorandum of points and authorities in opposition to the motion). Indeed, the plaintiff has even failed to depose these three defendants. Accordingly, the showing made by the defendants Entrekin, AMP and Little, Brown that there is no evidence to support the element of actual malice in the plaintiff's libel claim against them is undisputed on the record and this Court must grant their motion for summary judgment.

### B. *Defendant Andrew Cockburn*

The defendant Andrew Cockburn "edited and substantially revised" *Out of Control.*[7]

---

7. Andrew Cockburn's affidavit provides:

In May 1987 I began working with Leslie Cockburn, editing the manuscript of *Out of Control* that she had prepared and submitted to Atlantic Monthly Press ("AMP"). During the next several months I worked with Leslie Cockburn editing and reorganizing the manu-

script. I also helped my wife incorporate into the manuscript new material that was becoming available on an almost daily basis as a result of the ongoing investigation of the Iran–Contra Committees (which were then in the process of holding hearings). All writing

The plaintiff has failed to meet his burden in establishing that the defendant's showing of an absence of evidence on the element of actual malice is in dispute; the plaintiff has cited no record facts from which a reasonable jury could find, by the clear and convincing standard, that Andrew Cockburn knew that statements of and concerning the plaintiff in *Out of Control* were false or entertained serious doubt as to their truth.

■ The only fact to which the plaintiff points is the "candid admission that Mr. Cockburn 'worked with Leslie Cockburn editing and reorganizing the manuscript' as material became available 'on an almost-daily basis.'" *Plaintiff's Opposition* at 44. The plaintiff apparently is arguing that a close working relationship between an editor and an author makes the former strictly liable as an aider and abettor for any actual malice possessed by the latter. This Court again repeats, it is well-established that the constitutional requirement of actual malice must be individually shown as to each defendant. *Price v. Viking Penguin*, 881 F.2d at 1446; *Hunt v. Liberty Lobby*, 720 F.2d at 648–49. Even assuming that an aiding and abetting theory is appropriate in libel law, what remains constitutionally fundamental in order to impose liability is that the defendant acted *with* actual malice. *Tavoulareas v. Piro*, 759 F.2d 90, 136 (D.C.Cir.), *vacated in part*, 763 F.2d 1472 (D.C.Cir.1985) (en banc). Simply alleging a "close working relationship" or "aiding and abetting" is begging the fundamental question at issue before this Court, namely, where are the record facts from which a reasonable jury could find actual malice pursuant to the clear and convincing standard? The plaintiff has come forward with none and accordingly this Court must grant defendant Andrew Cockburn's motion for summary judgment.

### C. Defendant Leslie Cockburn

■ The plaintiff has failed to come forward with record facts from which a reasonable jury could find, pursuant to the clear and convincing standard, that the author Leslie Cockburn knowingly or recklessly disregarded the truth in making statements of and concerning the plaintiff in *Out of Control*. Accordingly, the plaintiff is unable to put into genuine issue or dispute the defendant's showing that the plaintiff's libel claim against her is without evidence on the element of actual malice.

#### 1. Failure by Author to Apprise Plaintiff of Contents

■ The plaintiff cites as evidence of defendant's actual malice behind every statement of and concerning him in *Out of Control* the fact that although the author interviewed plaintiff she neither apprised him of the specific information regarding him which she intended to print nor provided him with the opportunity to review the book for the purpose of correcting errors. If the caselaw is clear on any point it is that an author is under no duty to divulge the contents of a book prior to publication in order to provide the subject an opportunity to reply. *See, e.g., Loeb v. New Times Communications Corp.*, 497 F.Supp. 85, 93 (S.D.N.Y.1980) ("failure to verify statements with plaintiff and reliance upon some biased sources, in themselves, do not

---

suggestions that I made were read by and/or discussed with Leslie to assure their accuracy. *Andrew Cockburn Affidavit* at ¶ 3.

The plaintiff's own deposition of defendant Andrew Cockburn establishes that he was not involved in substantively writing *Out of Control* as a "co-author":

BY MR. KRAMER:
Q. Did you redraft entire paragraphs in your own words?
MR. RINGEL: Objection to form.
THE WITNESS: What do you mean by redrafting? I recommended that paragraphs be changed.

BY MR. KRAMER:
Q. Did you do any of the changing yourself?
A. You mean did I type them or what do you mean by doing them myself?
Q. Did you rewrite any paragraphs of the book yourself?
A. I suggested to Leslie Cockburn that paragraphs be rewritten. Sometimes I submitted ideas. I don't really know that I rewrote.
*Andrew Cockburn Deposition* at 42.

amount to reckless disregard of the truth"); *Peck v. Readers Digest Ass'n,* 17 Media L. Rep. (BNA) 1115, 1117 (N.D.Ohio 1989); *see also Edwards v. National Audubon Soc'y, Inc.,* 556 F.2d 113, 120 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977) (rejecting plaintiffs' argument that obtaining some information from plaintiffs but not conducting fuller investigation was evidence of actual malice).[8]

The decision of an author of what to specifically include in a book is the quintessential exercise of her First Amendment rights and to impose the duty that an author must first apprise the subject of the book of her substantive decisions would fundamentally undermine that exercise. For example, this Court can easily imagine the case in which an author informs the subject of a book of the contents to be published and is in turn threatened with a lawsuit by the subject unless specific changes are made. In some cases such threats may prevent the book from being published at all, especially in cases like the instant where the subject contends that "the entire text" is defamatory. Such prepublication threats, made to influence an author to change or eliminate specific contents of a book, would constitute a fundamental chilling of First Amendment rights.

Moreover, as a practical matter, such a duty to consult with the subject of a book of the statements to be published of and concerning him would be unduly burdensome. For example, where a book, like *Out of Control,* involves statements of and concerning hundreds of different individuals and groups, the requirement that the author provide each subject with a prepublication copy for review and comment would involve a substantial hindrance on the ability of writers and publishers to timely release information to the public.

Accordingly, the plaintiff cannot rely on the defendant's failure to consult with him

prior to the publication of *Out of Control* as evidence of actual malice.

### 2. *Bribery and Profiteering in Iran*

In regard to the defendant's statements of and concerning plaintiff's role in overseeing a program of weapon sales to Iran which involved bribery, *see* footnote 3 and accompanying text, *supra,* the plaintiff cites as evidence of actual malice the "fact" that "[t]he author apparently relied on a single, obviously unreliable source for their [sic] account of General Secord's alleged misconduct in Iran." *Plaintiff's Opposition* at 42. However, this claim is merely conclusory and not a record fact before this Court. The plaintiff has not pointed to any fact in the record to provide that the source is "obviously unreliable." More important, even assuming that this source was unreliable, the plaintiff has failed to point to any record facts to show that the author was subjectively aware that the source was unreliable, *i.e.,* that her use of the source was knowingly or recklessly in disregard of the truth.

The defendant's showing in the record of an absence of evidence on the element of actual malice with respect to her statements of and concerning the plaintiff's role in overseeing a program in Iran that involved bribery is voluminous. *See generally Leslie Cockburn Affidavit* at ¶¶ 33–43. The defendant makes the showing that she relied upon many sources which independently corroborate the statement of the unidentified "observer" whom the plaintiff characterizes as unreliable. As paragraph 37 of her affidavit provides:

As I testified at my deposition (Leslie Cockburn Dep. at 221–25) it had also been widely reported prior to the publication of *Out of Control* that the programs that Mr. Secord oversaw involved massive bribery. For example, the *Iran–Contra Connection,* a book published in 1987 prior to publication of my book and relied upon by me, reported that:

**8.** Indeed, a total failure to investigate does not establish actual malice. *See, e.g., St. Amant v. Thompson,* 390 U.S. at 731, 88 S.Ct. at 1325; *Tavoulareas v. Piro,* 817 F.2d 762, 789–90 (D.C. Cir.), *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987); *Hardin v. Santa Fe Reporter, Inc.,* 745 F.2d 1323, 1324 (10th Cir.1984). The plaintiff has cited this Court to no caselaw providing that an author must clear her statements with the subject of the book.

"In Iran, Hakim made a handsome living selling military equipment from such firms as Olin Corp., Hewlett–Packard and his own Stanford Technology Corp. Hakim's STC had a $5.5 million contract to supply the notorious, CIA–promoted IBEX project, which Secord oversaw. Secord reportedly helped Hakim win another, $7.5 million contract with Iran's air force for a sophisticated telephone monitoring system to allow the Shah to keep track of his top commanders' communications. The Shah's secret police, SAVAK, operated the equipment. Hakim's business methods were as controversial as his products: He arranged the latter communications deal through the air force commander, Gen. Mohammed Khatemi, who Hakim bribed on at least one other deal and who also received hefty payoffs for approving the IBEX contract." (Exh. 33.)

\* \* \* \* \* \*

"In the most notorious case, the CIA and Rockwell International pushed on Iran a gigantic electronic spying and communication system called IBEX....

"The IBEX project smelled for other reasons beyond its doubtful contribution to Iran's defensive needs. Rockwell paid huge bribes to Iran's air force commander (and the Shah's brother-in-law), Gen. Mohammed Khatami, to win approval for the $500 million project. Other military contractors, including Bell Helicopter, Northrop and Grunman, hired agents who bribed Iranian officials with handsome commissions, often amounting to millions of dollars." (Exh. 35) (footnotes omitted) (*Iran–Contra Connection* at 153).

\* \* \* \* \* \*

"Secord headed the Air Force Military Advisory Group, which in effect represented the U.S. arms merchants before the Shah.... That job would have given Secord a direct role (with the CIA) in the shady deal of IBEX...."

(Exh. 35) (*Iran–Contra Connection* at 156) (footnotes omitted).

I also read and relied upon: *Los Angeles Times*, February 14, 1987 ("One source who knew him said Secord helped Hakim get Air Force contracts, including one from the Iranian government for 15 million to install phone taps at the main Iranian Air Force base. In turn, Hakim provided intelligence to his contacts among U.S. intelligence officers in Iran.") (Exh. 40); P. Maas, *Manhunt* at 59 (Edwin "Wilson had tried to sell the Iranians [a surveillance system], using the good offices of General Secord in Teheran, but despite Secord's best efforts, SAVAK wasn't in the market ...") (Exh. 41); S. Rosenfeld, *San Francisco Examiner*, December 9, 1986 (linking both Hakim and Secord to the IBEX project and describing Hakim as a "bag man for U.S. concerns seeking approval from Iranian officials on military sales") (Exh. 42).

*Leslie Cockburn Affidavit* at ¶ 37 (footnote omitted).

Furthermore, paragraph 34 specifically details the basis of the author's assertion that General Secord did head the Air Force Military Assistance Advisory Group in Iran in the late 70's:

As one published source stated: "According to his Pentagon biography Secord 'acted as chief advisor to the commander in chief of the Iranian air force and managed all U.S. Air Force programs to Iran as well as some Army and Navy assistance programs.'" J. Marshall, P. Scott and J. Hunter, *Iran–Contra Connection* at 156 (Exh. 35). The MAAG, whose Air Force contingent was headed by Secord, according to the authors "in effect represented the U.S. arms merchants before the Shah." *Id.*

"Shah Mohammed Reza Pahlevi himself complained that he sometimes was unable to tell whether various weapons systems were promoted to further U.S. policy or to generate profits for defense contractors and fees for their representatives....

" 'You Americans pretend to be so righteous,' fumed the ruler when U.S. Senate investigators were alleging corruption by Iranian military commanders in connection with defense contractors.

" 'But,' he continued in the presence of a high American official, 'it is hard for me to believe that your MAAG officers (the military advisory group at the U.S. Embassy) haven't already been hired by American companies and aren't under their influence.... Are they giving me real advise or just promoting companies?' " *Los Angeles Times,* 2/3/80. (Exh. 36).

*Leslie Cockburn Affidavit* at ¶ 34.

The plaintiff has not cited to any record facts to demonstrate that the author either knew that the above sources were wrong or had serious doubt as to their credibility. The U.S. Court of Appeals for the District of Columbia Circuit has held that "good faith reliance on previously published sources" as to the matters at issue "precludes a finding of actual malice as a matter of law." *Liberty Lobby v. Dow Jones,* 838 F.2d at 1297.

In regard to the defendant's statements concerning "official profiteering" in Iran, the plaintiff himself has agreed to an operative definition of the phrase "official profiteering"; in his deposition the plaintiff admitted that if there were price differences between the cost of the weapons to the United States and their subsequent sale to the Iranians then those differences would constitute "official profiteering" unless actually incurred expenses justified the cost differentials. *Secord Deposition (II)* (attached to *Ringel Affidavit*) at 21–30.

The author's affidavit provides:

It was well-known that the Shah was paying inflated prices for U.S. equipment at this time and I had seen several documents demonstrating this. For example, as noted in *The Iran–Contra Connection* at 156,

"Erich von Marbod, [who] had worked closely with Secord to arrange covert financing for CIA–directed Thai guerillas fighting in Laos in the early 1970s

... championed the Carter administration's controversial proposal to sell Iran 8 Airborne Warning and Control System (AWACS) planes, a system blasted by the General Accounting Office as too advanced for Iran's needs and overpriced." (Exh. 35)

The AWACS planes were to have been sold to the Iranians at $102.671 million each (in addition to a separate $510.2 million contribution for spares, maintenance support, site surveys and training) under a 1977 contract; a year later, the United States Air Force bought more sophisticated versions of the same plane for $78.1 million each. T. Gervasi, *Arsenal of Democracy II* (1981) (*"Arsenal"*) at 137. (Exh. 43.) The Khomeni government cancelled Iran's order, and the planes were never delivered. *Id.* at 272.

Other military equipment sold or delivered to Iran by the United States during Mr. Secord's tenure as head of the Air Force MAAG in Teheran (1975–8) was similarly overpriced as compared to sales to other allies or to the United States armed services. In 1974, Iran ordered several hundred AIM 54–A air-to-air missiles for delivery in 1976 through 1978 at a cost of $708,000 each; the 1976 unit procurement cost to the United States Navy of the same missiles was $363,823. Stockholm International Peace Research Institute, *World Armament and Disarmament* (1978) (*"World Armament"*) at 264 (Exh. 44); *Arsenal* at 213. Also in 1974, Iran ordered 80 F–14A Tomcat aircraft for delivery in 1976 and 1977 at a price of $23.750 million each; in 1978, the unit procurement cost to the United States military was $20.624 million each. *World Armament* at 265; *Arsenal* at 97. In 1978, Iran ordered (and later cancelled) 160 F–16 aircraft at $14.844 million each; the cost of the same aircraft to the United States military in 1978 was $9.482 million each. *Arsenal* at 272, 283. Iran ordered (and later cancelled) August 1978 delivery of 186 AIM–9H air intercept missiles for $75,268 each; the 1975 unit procurement

cost to the United States Navy was $17,-176 each. *Arsenal* at 211, 272.

*Leslie Cockburn Affidavit* at ¶ 41.

The plaintiff has failed to come forward with any record facts to put the defendant's showing of an absence of evidence on the element of actual malice into dispute; a reasonable jury would be unable to find under the clear and convincing standard that the defendant acted with knowing or reckless disregard for the truth.

### 3. *La Penca Bombing*

In regard to the defendant's statements involving the attempted assassination of Contra leader Eden Pastora at La Penca, *see* footnote 1 and accompanying text, *supra*, the defendant's affidavit provides:

> Mr. Secord's name is not used, nor is he referred to by implication, in connection with La Penca. I did not intend to state that, nor did I understand the book to accuse Mr. Secord of, playing a role in the La Penca assassination attempt.

*Leslie Cockburn Affidavit* at ¶ 18. Although the plaintiff deposed the author for two full days, he has not been able to point to any record facts to put into dispute her showing of an absence of evidence in the plaintiff's libel claim to support the element of actual malice in any implication of the plaintiff in the La Penca assassination attempt.

The plaintiff contends that the fact that the defendant made her statements in regard to the La Penca bombing on the basis of an affidavit filed by Danny Sheehan in *Avirgan v. Hull* is evidence of actual malice. However, the plaintiff can point to no record facts to demonstrate that the defendant knew that the Sheehan affidavit was false or that she had serious doubt as to its truth.

The plaintiff points to the "paste over page 103 containing the corrections regard-

ing the alleged involvement of former State Department official Richard Armitage in drug trafficking." *Plaintiff's Opposition* at 37. The plaintiff is referring to the fact that after publication of *Out of Control* the Sheehan affidavit in *Avirgan v. Hull* was amended to delete the portions upon which Leslie Cockburn relied for certain allegations concerning Richard Armitage. At the request of Armitage a sticker was affixed in the unshipped copies to the two pages of the book which discussed Mr. Armitage. That sticker explained the post-publication withdrawal of Sheehan's original affidavit.[9] *Entrekin Affidavit* at ¶ 16; *Leslie Cockburn Affidavit* at ¶ 17.

The plaintiff's reliance on the Armitage "paste-over" as a fact to show that the defendant knew the Sheehan affidavit was false or that she had serious doubt as to its truth is fundamentally misplaced. The Sheehan affidavit was amended *after* publication of *Out of Control* and does not show that at the time of publication that the defendant knew the affidavit was false or had serious doubt as to its truth. To argue that evidence of actual malice exists by the mere fact that subsequent events determine the falsity of a source or statement would be tantamount to conflating the actual malice and falsity elements of a libel action. Accordingly, it is hornbook libel law that post-publication events have no impact whatever on actual malice as it bears on this lawsuit since the existence or non-existence of such malice must be determined as of the date of publication. *See, e.g., Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984) (evidence must establish that defendant "realized the inaccuracy at the time of publication"); *New York Times Co. v. Sullivan,* 376 U.S. at 286, 84 S.Ct. at 729 (1964)

---

9. The "paste over" provides in part:
 The discussion on these pages concerning Mr. Richard Armitage was initially drawn from allegations filed by Daniel Sheehan and the Christic Institute as counsel in a 1986 lawsuit. (See pp. 97, 262.) In June 1988, a federal judge dismissed on summary judgment all of Sheehan's charges in the 1986 lawsuit. While Sheehan has appealed, Shee-

han had on his own restated his case shortly before the dismissal (and after the publication of this book) to omit virtually all the allegations reported on these pages concerning Mr. Armitage and all claims of evidentiary support. Mr. Armitage has consistently and vigorously denied each and every one of Sheehan's allegations of wrongdoing as "ludicrous" and "baseless."

(malice must be shown "at the time of publication"); *Sharon v. Time, Inc.*, 599 F.Supp. 538, 564 (S.D.N.Y.1984) ("actual malice rests on the defendant's state of mind at the time of the publication").

The plaintiff also contends that defendant's reliance on the Sheehan affidavit is evidence of actual malice because several investigators and reporters expressed significant doubts in an article in the February/March 1988 issue of *Mother Jones* about Sheehan's credibility and the veracity of his allegations. Again, however, this article was published three months *after* the publication of *Out of Control* and accordingly is not relevant to the author's state of mind at the time of publication. Moreover, even assuming that the article existed prior to or at the time of publication of *Out of Control*, and that the defendant was aware that Sheehan had his detractors, the mere fact that divided opinion exists among reporters as to the credibility of an individual does not reflect on the defendant's state of mind and actual malice. The plaintiff has failed to demonstrate that Ms. Cockburn was aware that other reporters questioned the reliability of Sheehan.[10]

#### 4. Drug Trafficking

This Court repeats that in order to defeat the defendants' motion for summary judgment the plaintiff must come forward with "evidence in the record [that] could support a reasonable jury finding that the plaintiff has shown actual malice by clear and convincing evidence." *Anderson v. Liberty Lobby*, 477 U.S. at 255–56, 106 S.Ct. at 2514. The plaintiff is unable to meet this burden with respect to the defendant's statements of and concerning the plaintiff

about drug trafficking in Southeast Asia and in Central America. *See* footnote 2 and accompanying text, *supra.*

The plaintiff contends that "[t]he statements regarding plaintiff's alleged involvement in drug trafficking in Southeast Asia are drawn from the Sheehan affidavit and its unnamed sources." *Plaintiff's Opposition* at 39.[11] The plaintiff states that defendant's reliance on the Sheehan affidavit is a fact which is illustrative of actual malice. Again, however, the plaintiff fails to point to any record facts to demonstrate how reliance on the Sheehan affidavit is probative of defendant's state of mind and actual malice at the time of publication of *Out of Control.* *See* Part 3, *supra* (this Court's discussion of the Sheehan affidavit).

The defendant's affidavit provides that with respect to her statements in regard to drug trafficking in Southeast Asia she relied on much more than the Sheehan affidavit. The defendant in her affidavit provides a detailed showing of the absence of evidence to support the element of actual malice in plaintiff's libel suit on these statements. Her affidavit provides:

> Both Vang Pao's and Air America's involvement in opium trafficking, and the CIA's sponsorship of Vang Pao, were well documented by accounts I had read prior to publication and which I credited. Those accounts included A. McCoy, *The Politics of Heroin in Southeast Asia* (1972); former CIA agent Victor Marchetti's *The CIA and the Cult of Intelligence* (1974); C. Robbins, *Air America: The Story of the CIA's Secret Airlines* (1979); and R. McGehee, *Deadly Deceits: My 25 Years in the CIA* (1983). These

---

**10.** The plaintiff contends that it is implausible that Ms. Cockburn did not recall at her deposition whether she was aware that at the time of publication of *Out of Control* other journalists were discovering Sheehan's allegations without foundation. However, the plaintiff has the affirmative duty to develop a record of actual malice in order to survive the defendants' motion for summary judgment. For example, as part of preparing for the Ms. Cockburn's deposition, the plaintiff could have interviewed journalists who suspected the credibility of Sheehan to determine whether they had on prior occasions discussed their views of Sheehan with

Cockburn. Moreover, the plaintiff could have produced accounts or articles critical of Sheehan which were published *prior* to the time that *Out of Control* was published.

**11.** The defendant wrote in *Out of Control* that the "CIA Station [in Laos] threw its weight behind one of the competing warlords, a certain Vang Pao" and that Vang Pao engaged in opium trafficking, in part through the use of Air America, the CIA's own proprietary airline. *Out of Control* at 100–102.

accounts established that Vang Pao had established a heroin laboratory at Long Tieng—the town where the CIA had its Laotian quarters (*Politics of Heroin* at 248–49 and n. 23, 281 and 247: "the U.S. Bureau of Narcotics reports that Gen. Vang Pao, Commander of the CIA's Secret Army, has been operating a heroin factory at Long Tieng, headquarters for CIA operations in northern Laos" (Exh. 32); *Air America* at 138, 232, 237–38) (Exh. 31); that the CIA turned a blind eye (or, to use the phrase of Mr. Secord's complaint as to other matters, "acquiesced in and condoned") towards Vang Pao's narcotics activities (*Air America* at 230, 237 ("[w]hile the Meo fought the war for the CIA, the agency turned a blind eye to their generals' profitable sideline in opium") (Exh. 33; *Cult of Intelligence* at 254 (Exh. 34); *Politics of Heroin* at 353 (Exh. 32) ("American involvement has gone far beyond coincidental complicity; embassies have covered up involvement by client governments, CIA contract airlines have carried opium, and individual CIA agents have winked at opium traffic"); and the CIA Airline, Air America, carried opium to Long Tieng and other locations. *Id.* These books are well respected and credible, and I believed (and believe today) that the accounts I have referred to are accurate. (The pages I refer to from these books in this affidavit are attached as Exhs. 32–34.)

12. Much of plaintiff's discussion of actual malice, rather than pointing to specific record facts, is simply conclusory argument. For example, the plaintiff provides:

Again, the plaintiff expects to discovery that the defendants purposefully distorted and exaggerated accounts of alleged drug trafficking be persons indirectly linked to the Contra supply effort to make it appear, falsely, that plaintiff and other members of Contra resupply were themselves directly involved in such activity, in order to embarrass the Administration and to influence public and Congressional opinion against further Contra aid.

*Plaintiff's Opposition* at 40. The plaintiff points to no record basis to support his contention of what he expects to discover.

This Court further notes that when the author relies upon a convicted felon as a source she points out that fact in *Out of Control*. *See, e.g.,*

*Leslie Cockburn Affidavit* at ¶ 31; *see also Leslie Cockburn Affidavit* at ¶ 32.

■ In regard to the "the allegations and implications of plaintiff's alleged participation in drug trafficking in Central America" the only fact to which the plaintiff points is that a number of the author's sources are convicted felons.[12] The plaintiff apparently is advancing the argument that anything a convicted felon states is false and accordingly any reliance on such statements ipso facto constitutes evidence of actual malice. This Court cannot accept such reasoning. The use of convicted felons cannot alone constitute a fact of actual malice. Rather, the plaintiff must specifically establish that there were surrounding circumstances in relying upon a particular felon as a source which would constitute evidence of a knowing or reckless disregard of the truth (*i.e.*, the author knew that the particular felon had a long history of unreliability as a source). The caselaw is clear that the plaintiff must establish that even in relying upon an otherwise questionable source the defendant actually possessed subjective doubt. *St. Amant v. Thompson*, 390 U.S. at 730, 88 S.Ct. at 1325; *Price v. Viking Penguin*, 881 F.2d at 1441; *Hardin v. Santa Fe Reporter*, 745 F.2d at 1325–26; *Loeb v. New Times Communications*, 497 F.Supp. at 93. The plaintiff has pointed to no record facts to put at issue whether the defendant knew that the allegations of her sources were false or had serious doubt as to the truth of their allegations.[13]

*Out of Control* at 168 (George Morales "jailed and eventually sentenced to sixteen years in prison" for "the importation and sale of very large quantities of cocaine"), 172 (Gary Betzner "was serving fifteen years on a drug charge unrelated to his contra missions"), 178 (Geraldo Duran "served a brief jail term in Costa Rica when apprehended with a 421–pound cocaine shipment bound for the Bahamas") and 179 (Michael Tolliver "was serving a two-year drug sentence on charges, as with Betzner and Morales, unrelated to CIA–White House-contra affairs"). Accordingly, the defendant has provided a basis for the reader to assess the credibility of the sources' allegations.

13. Ms. Cockburn's affidavit provides that she credited the accounts that were detailed by these former convicted felons. *Leslie Cockburn Affidavit* at ¶¶ 25 to 27. For example, as para-

As the record facts illustrate, the defendant relied upon many sources other than convicted felons. Her sources included a United States Senator, Senate staff members, Oliver North's notebooks and testimony before Congress, and other published sources. *See Leslie Cockburn Affidavit* at ¶¶ 25–28.

Paragraph 25 of her affidavit provides, in part:

> [O]n September 24, 1986, the Costa Rican Interior Minister (Santa Elena is in Costa Rica) announced that his government had discovered and shut down an airfield (Santa Elena) that he stated had been used for resupplying the Contras, for drug trafficking or for both. This announcement was reported in the September 25, 1986 edition of the *New York Times* (Exh. 12), which I saw and was subsequently discussed in the Report of the Congressional Committees investigating the Contra Affair ("Iran–Contra Report") at 142–44 (Exh. 13.) I was also aware that Lewis Tambs, the then-U.S. Ambassador to Costa Rica was concerned in mid–1986 about the possibility of drug traffickers using Santa Elena. I knew, for example, that CIA station chief Thomas Castillo had testified in May, 1987 in his Iran–Contra deposition that Ambassador Tambs wanted to place armed guards at Santa Elena to avoid the possibility of having drug traffickers use that site. *See* Exh. 14 (Castillo Cong. Deposition at 483; later released by Congress.) Thus, there was a substantial body of information linking the Santa Elena airstrip, built with Mr. Secord's assistance, to drug flights.[14]

Paragraph 28 provides in part:

> I did, of course, have substantial evidence that there were links between Contra activities generally and drug running. * * * I spoke with Senate Subcommittee on Narcotics[, Terrorism and International Operations of the Senate Foreign Relations Committee] members and staff on numerous occasions prior to publication of *Out of Control*. Indeed, I reported on the subcommittee's investigation, which began in the Spring of 1986, in three CBS broadcasts prepared and broadcast prior to publication of *Out of Control*. In addition to the information discussed above, I was aware of a good deal of information linking the Contra resupply efforts and drug trafficking. For example:
>
> * I was aware that portions of Oliver North's notebooks, which had been produced by North to the Iran–Contra Committee in 1987, contained a number of references to drugs or drug-smuggling and that the Senate Subcommittee on

graph 26 of her affidavit provides, the defendant had additional information and sources which in her mind corroborated the credibility of Michael Tolliver:

> [P]ilot Mickey Tolliver was interviewed on videotape for CBS News and he said that his guns-for-drugs flights were carried out at the request of Rafael Quintero. [Footnote omitted.] *(A transcript is annexed as Exh. 16.)* Tolliver later repeated this story to Jack Blum (the chief investigator for Senator Kerry's Subcommittee on Narcotics, Terrorism and International Operations and Knut Royce (a *Newsday* correspondent) who published Tolliver's story in *Newsday* in April 1987. (Exh. 17 is a computer print-out of the article I read at the time of the publication.) After speaking to Tolliver, we tracked the aircraft used by Tolliver to one Michael Palmer, a known marijuana smuggler who, as an executive of a Florida firm named Vortex, had received a State Department contract in early 1986 to ship Contra aid. (A copy of a newspaper article dated March 22, 1987 relating to Vor-

tex, with my handwritten notes relating to the aircraft, is annexed as Exh. 18.) In my mind this reinforced the credibility of allegations that linked drugs to aspects of Contra supply. I believed Tolliver was telling the truth. A further confirmation came from Shirley Brill, a *former CIA employee and long-time girl-friend of Thomas Clines, an individual who had worked with Mr. Quintero and Mr. Secord. Ms. Brill alleged in March 1987 that Rafael Quintero had business dealings with narcotics traffickers in south Florida. In a later taped interview, Brill reiterated this statement. (A transcript of the relevant portions of that tape are annexed as Exh. 19.)

**14.** The plaintiff does not dispute that he was involved in the construction of the Santa Elena airstrip. Mr. Secord himself testified before the Iran–Contra Committee in May 5–8, 1987 that he had been responsible for the construction of the airstrip. *Secord Cong. Testimony* at 44, 62–64 (attached as Exhibit 9 to *Leslie Cockburn Affidavit* ).

Narcotics intended to subpoena them. These diaries, and several memoranda that I had seen prior to publication (*see, e.g.,* Exh. 20 (memorandum from Rob Owen to Oliver North, dated April 1, 1985, discussing "Blackie" Chamorro at p. 3)), reflected that Oliver North—Mr. Secord's contact with the government in connection with what Mr. Secord has called "The Enterprise"—was warned repeatedly of drug connections on the part of Contra leaders and arms suppliers.

\* \* \*

\* As detailed in my July 1987 broadcast for *West 57th,* two companies, Ocean Hunter and Frigorificos de Puntarenas, that received over $200,000 from the State Department for "humanitarian aid" to the Contras, were deeply involved in cocaine trafficking. My sources for this link included FBI documents, on-camera interviews, bank records, customs documents, sworn testimony given to the Kerry Committee, and interviews with defense lawyers, DEA bounty hunters, and Coast Guard officials, among others. State Department documents that I had reviewed showed that Robert Owen, who worked directly under Oliver North in the Contra resupply operation, was overseeing the Ocean Hunter/Frigorificos accounts while the companies were under active investigation by the DEA, Customs and the Coast Guard.

\*　　\*　　\*　　\*　　\*　　\*

\* A number of newspaper reports published prior to the release of *Out of Control,* some quoted in the book, reported allegations of drug flights being made in connection with the contra effort. (*See e.g.,* Ex. 27.) Many of these articles reported on pending congressional or other investigations on this subject. *See, e.g.,* "Top 'Contras' Under Scrutiny for Corruption," *Christian Science Monitor,* 4/11/86; "2 Hill Panels Probing Alleged Links Between Contras and Drug Trafficking," *Washington Post,* 8/8/87; "U.S. Probing Drug Link to CIA's Flights: Officials Suspect Drug Runners Used CIA Contra Supply Flights," *Boston Globe,* 4/25/87; "Inquiry Reported Into Contra Arms," *New York Times,* 4/11/86; "Cocaine, Gun Charges Probed," *Washington Post,* 4/11/86; "Four Legislative Panels Study Accusations Against Contras," *Miami Herald,* 5/14/86; "Big Bay Area Cocaine Ring Tied to Contras," *San Francisco Examiner,* 3/16/86.

This Court will not quote all of these newspaper articles but quotes one as part of the defendant's showing in the record that there is an absence of evidence to support the element of actual malice in the plaintiff's libel claim in regard to defendant's statements that Contra activities and the activities of drug traffickers are intimately connected. The April 11, 1986 article in the *Christian Science Monitor* provides:

[C]onservative Representative Charles Stenholm (D) of Texas, ... voted for contra aid. Despite his vote, he is also very concerned about the allegations of corruption in the contras.

"There is no doubt in my mind that an overwhelming majority of the members of the House want to stop communism in Nicaragua," he says. "But the question is: How do you do it? These allegations are troubling, and I think they are credible. I have spoken to the President, the vice-president, and the secretary of state about them. We were very much aware of Sandinista involvement in drugs, which has been well documented. What we did not know is that maybe the contras are doing it, too."

The congressman, when asked, stated that it was his understanding that one top FDN leader closely linked to FDN chief Calero was being investigated by the US Customs Service for charges of alleged involvement in drug trafficking.

\*　　\*　　\*　　\*　　\*　　\*

[John] Mattes [an attorney in the U.S. Public Defenders Office] also said that in his interviews he discovered "convincing allegations" of contra gunrunning and drug trafficking.

"A number of very serious allegations have surfaced which suggests that those involved in the contra movement have

engaged in a wide range of criminal activities in the US and in the region," Senator Kerry told the *Monitor*.

"The very serious nature of these allegations strongly suggests the need for a detailed and complete congressional inquiry."

Moreover, the defendant has further shown that there is an absence of evidence in the record of actual malice behind any statement by the defendant that the plaintiff himself was aware of the connection between drugs and guns in the contra supply effort. The defendant's affidavit provides in part:

A prime example of this acquiescence is reflected by the use in the Contra resupply operation of Contra commander Fernando ("Blackie" or "El Negro") Chamorro despite knowledge by Oliver North, Rob Owen and Mr. Secord that he had ties to drug traffickers. As I reported in *Out of Control* at 88, Chamorro had been identified by Rob Owen in an April 1, 1985 memorandum to Oliver North as a problem drinker who surrounded himself with profiteers and drug runners. (Exh. 20). In an August, 1987 pre-publication telephone interview I asked Mr. Secord about these allegations and he confirmed that he had "heard those allegations" and "most of them are true." * * * My notes of this conversation (which are annexed as Exh. 30) [footnote omitted] read:

"when asked why Blackie Chamorro was chosen as the leading commander for the southern front in light of Rob Owens memo to North about drinking, drug trafficking, and stealing money from the USG) 'all we were was a trucking company. I've heard those allegations. Most of them are true. I didn't pick them. (the commandantes) the Agency picked them."

(I understand that in his deposition Mr. Secord confirmed the accuracy of this quotation. Secord Dep. (II) at 244.)

I had other information that supported my conclusion at the time of publication that Mr. Secord had, in fact, acquiesced in or condoned drug activity involving the Contras. At the time *Out of Control* was published I also knew (because Mr. Secord had told me) that Mr. Secord had commissioned a former F.B.I. agent in Miami to investigate drug charges involving another arms dealer working with the Contras (Ronald Martin), and received a report from this agent that such charges might well be true. Yet Mr. Secord did not pursue these allegations. (See notes of my conversation with Mr. Secord. (Exh. 30).)

*Leslie Cockburn Affidavit* at ¶¶ 29, 30.

The plaintiff did not meet his burden of putting into dispute the defendant's showing of an absence of evidence of actual malice. The plaintiff's burden was to come forward with record facts from which a reasonable jury could find pursuant to the clear and convincing standard that the defendant wrote *Out of Control* with knowing or reckless disregard for the truth. The plaintiff was unable to point this Court to a single fact and the defendant's showing of absence of actual malice remains undisputed on this record. Accordingly, this Court must also grant the defendant Leslie Cockburn's motion for summary judgment.

It hereby is

ORDERED that the defendants' motion for summary judgment be, and the same hereby is, GRANTED.